Cox et al. vs. Von Ahlefeldt et al.

---

## No. 13,364.

MRS. MARGARET R. COX ET. AL. VS. MRS. NANNIE VON AHLEFELDT ET AL.

### SYLLABUS.

1. A judgment which does not determine the rights of the parties is not *res judicata*. The vendor's lien attacked by the plaintiff was not affected by or involved in the proceedings before the court of West Virginia in which the judgment was rendered which the defendants plead as *res judicata*.

2. The immovable property of a non-resident is subject to the laws of this State (C. C. 9), and in settling his succession here it must be opened and administered as that of persons domiciled in this State.

3. No one is the heir of the living. A transaction based upon the idea of a future right to the succession of one living is devoid of consideration. Though such a stipulation may have been valid in West Virginia, it can have no effect under the civil law. (The original act of sale between the first vendor and his vendee was not based on real and substantial consideration as between vendor and vendee, and third persons.)

4. The purchasers from the original vendee were not in bad faith in buying the property from this vendee, who had no title. The sale of the property of another is not entirely void when the purchaser is not in bad faith, and it is therefore subject to prescription less than the longest term of prescription (thirty years). Unless it comes within some exception, such a sale falls within the prescription of ten years. Here, there is a special prescription controlling, that is the prescription of five years.

Cox et al. vs. Von Ahlefeldt et al.

5.  While it is true that the forced heir stands in the shoes of the *de cujus* and
    that *le mort saisit le vif* is a controlling doctrine, yet when heirs have gone
    into possession under the will under an order of court made contradictorily
    with a co-heir, he is concluded so far as relates to possession, and he must
    bring a direct action for the *legitime*.

6.  The heir being in possession under the will, the remedy of the co-heir not in
    possession is by an action for the *legitime* and this heir cannot ignore the
    will and sue for his portion. Where a forced heir is deprived of his portion
    under the will, and he is not in possession, he has an action for his *legitime*
    part.

7.  This action is prescribed by five years. C. C. 3541.

8.  The decree heretofore rendered by this court does not have the effect of *res
    judicata* as relates to prescription. The exceptions filed were overruled and
    the plea of prescription remained to be considered.

9.  More than five years had elapsed at the date of the filing of the instant suit.
    *a.* Prescription runs against all persons save when under certain exceptions.
    *b.* Minors and persons under interdiction cannot be prescribed against except
    in cases provided by law. Art. 3522, C. C.
    *c.* One not interdicted is not within the terms of that article. The heir from
    whom plaintiffs inherit never was interdicted.
    *d.* A suit brought in her name would have had the effect of interrupting pre-
    scription, and she or her heirs were not without power to bring an action to
    safeguard their rights, and, therefore, they cannot avail themselves of the
    maxim *contra non valentem*.

10. The claims of the heirs who are minors are within the terms of the law sus-
    pending prescription during their minority, and as to them the claim is not
    prescribed.

11. The right to reduce is not in suspense until the simulation is decreed, for sim-
    ulation is a mere shadow with nothing about it to prevent the heir from as-
    serting his right to the *legitime*.

12. The heirs regularly in possession and in good faith are not bound to demand
    possession of one not in possession, and who has never pretended to be in
    possession ; but, on the contrary, the law gave consent to the possession of
    her co-heir.

13. There was no attempt made at concealing fraud. The facts were all recorded.
    Whatever ignorance there was on the part of the plaintiffs, it was of law
    and not of fact.

### ON REHEARING.

1.  The rule *le mort saisit le vif* as established by C. C. 940, applies as well to
    the universal legatee as to the forced heirs ; and, construing the article men-
    tioned with Articles 1504 and 3542, it follows that a testamentary donation,
    although exceeding the disposable portion, confers a title which is defeasible
    only at the suit of the forced heir, or his heirs or assigns, brought within five
    years.

2.  The law of this State being unambiguous, to the effect that the action for
    reduction may be brought by the heirs or assigns of the forced heir, the
    courts are without authority to limit the right so conferred to forced heirs
    or resident heirs of the forced heir.

3.  The maxim *contra non valentem agere,* etc., has no place in the law of this
    State, and if it has been admitted through any breach in the jurisprudence,
    that breach will not be widened.

TERM OF 1900-1901. 545

Cox et al. vs. Von Ahlefeldt et al.

4. Those who claim exemption from prescription by reason of ignorance resulting from fraud must allege and show that such ignorance was neither wilfull nor negligent.
5. The beneficiaries of an excessive donation having organized themselves into a corporation with the donated property as their capital, and the interest of such donees and of such corporation being identical ; *held,* that a suit for reduction on behalf of the forced heirs is properly brought at the same time against such donees and the corporation into which they had thus organized themselves.

APPEAL from the Twentieth Judicial District Court, Parish of Ascension—*Guion, J.*

*Fenner, Henderson & Fenner, Richard McCulloh, Leigh Robinson* and *Alexander Ferdinand Mathews,* for Plaintiffs, Appellants.

*Joseph C. Gilmore, Carleton Hunt, Samuel L. Gilmore* and *Edward N. Pugh,* for Defendants, Appellees.

The opinion of the court was delivered by BREAUX, J. (WATKINS, J., dissenting).

On rehearing by MONROE, J. (BREAUX, J., concurring).

BREAUX, J. Plaintiffs sue for judgment against the defendants, decreeing that the sale from Oliver Beirne to Mrs. Nannie Von Ahlefeldt, made on the twenty-first day of January, in the year 1886, be annulled as a fraudulent simulation, also her title to a plantation, known as the "Houmas," and decreeing further, that it was the property of Oliver Beirne at the time of his death, and subject to all the rights of Susan Beirne Robinson, one of the forced heirs of Oliver Beirne. Plaintiffs also ask that the sale of this property by Mrs. Von Ahlefeldt, vendee of Oliver Beirne, to the children of William Porcher Miles be decreed null in so far as it affects their rights, and that they be recognized as owners in the proportion stated by them in their petition, and also that they are entitled to rents and revenues of the property; and, lastly, in case the court holds that the acts assailed had any realty, as disguised donations (which they deny), then that they be decreed to be entitled to relief by reduction of the donations made.

Plaintiffs, *inter alia,* set out in substance that the property in which they claim the legitime, and to recover which they ask to have decreed

the simulation charged, belonged to Oliver Beirne at the date of his death; and that Susan Beirne Robinson, from whom they inherited, became the owner of this non-disposable portion or *legitime,* and that they have the right to have the act of sale from Oliver Beirne to Mrs. Von Ahlefeldt, and the title to the Houmas place, in her name, decreed to be fraudulent simulations.

As relates to the status of Susan Beirne Robinson, the one from whom they inherit, they aver that although there was no judicial appointment of a guardian after she had reached majority, yet, in certain judicial proceedings in the Circuit Court of Monroe County, West Virginia, entitled Oliver Beirne, Executor, vs. Sallie C. Beirne *et al.,* to which Mrs. Von Ahlefeldt, as guardian of Susan Beirne Robinson, was a party defendant (as were also all the Miles children), it was judicially determined that Susan Beirne Robinson had been an imbecile since her birth, and that such imbecility is both mental and physical, and is permanent, and that the decree was affirmed by the Supreme Court of Appeals of West Virginia. Plaintiffs deny that the sales in question (which they attack as simulated) have any reality, yet, plaintiffs aver, in case it should be claimed by the defendants and should, on any ground, it be held that these acts have any reality, as disguised donations, then they are entitled to have such donations reduced to the disposable portion. Plaintiffs charge that defendants were aware that Mrs. Von Ahlefeldt had no title to the property and that they bought it knowing that it was subject to the rights of Susan Beirne Robinson. Defendants, in their answer and exceptions, set up a number of grounds controverting plaintiffs' demands.

Susan Beirne Robinson, from whom plaintiffs claim to have inherited, was born in West Virginia, on January 25th, 1871, and died January 4th, 1894, leaving no ascendants or descendants. At her death, the nearest surviving relations were the brothers and sisters of her late father, or their descendants, and Mrs. Nannie Von Ahlefeldt, her maternal aunt. Susan Beirne Robinson was the daughter and only child of Susan Beirne, and the only issue of her marriage with Henry A. Robinson. Susan Beirne Robinson, whose physical and mental condition was, as alleged, was never interdicted. Her father, Henry A. Robinson (her mother having died August 12th, 1885), sold a plantation, the Walnut Grove, to Oliver Beirne for the sum of one hundred thousand dollars. This plantation had been deeded previously by Oliver Beirne to his daughter, Mrs. Robinson, mother of Susan Beirne Robin-

son, and was sold by Robinson to him for the amount just stated. The vendor, Henry A. Robinson, declares in the deed to Oliver Beirne that he sells all claims that he may have in the property by virtue of his being the father of Susan Beirne Robinson. The intention was, it appears, that if Oliver Beirne died prior to his son-in-law, Henry A. Robinson, in that event the son-in-law would relinquish to the heirs of Oliver Beirne his right as father and guardian of his minor daughter, Susan Beirne Robinson.

In this deed, the vendor appointed Oliver Beirne the guardian of the person and the estate of his daughter, Susan Beirne Robinson, and Oliver Beirne bound himself to provide for her (his grand-daughter) as long as she lived. The deed proceeds. "It being intended that if the said Oliver Beirne should die before the said Henry Robinson, or the said Susan Beirne Robinson, then and in that event, said Henry Robinson relinquishes and releases to said Oliver Beirne and to his heirs, all rights, title, or claim he has or might have by virtue of his being the father and natural guardian of said Susan Beirne Robinson."

At the death of Henry A. Robinson, in 1885, his estate, consisting mostly of the sum of one hundred thousand dollars, received by him from Oliver Beirne, vendee, was inherited by his brothers and sisters, the present plaintiffs. The defendants insist that under the terms and conditions of the sale made by Oliver Beirne with the view of providing for Susan Beirne Robinson, Henry A. Robinson was greatly benefited, and that, afterwards, plaintiffs, by the inheritance of the said amount, shared in this benefit.

In 1885, Oliver Beirne made his will, reciting therein that he had bought a plantation in Virginia, known as Walnut Grove, from Henry A. Robinson, which property he directed to be managed by his executors and the revenues necessary for the support of the afflicted Susan Beirne Robinson set aside for that purpose as long as she lived, and if Mrs. Von Ahlefeldt were to survive said Susan Beirne Robinson, the property was to revert to her to be disposed of as she saw proper. But if Susan Beirne Robinson survived her aunt, Mrs. Von Ahlefeldt, this property, at her death, was to be divided between the testamentary heirs. The children of William Porcher Miles, who were also the grandchildren of the testator, Beirne, were made the residuary legatees under the will. The following is a codicil to said will: "I have paid my son-in-law, William Porcher Miles, for attending to my business in Louisiana five thousand dollars per annum, and recommend my daughter to

continue the said amount to the said Miles, and I would further advise its continuance until the estate is finally wound up in accordance with this will." The will of Oliver Beirne was admitted to probate in Monroe County, West Virginia, on April 27th, 1888. In December of that year, before one of the courts of West Virginia, the executors of the will brought an action to have it interpreted. It was interpreted by the courts of that State, and the provisions regarding the maintainance and care of Susan Beirne Robinson were construed, and, as construed, the court ordered them to be enforced for the protection of the child Susan.

In 1886, Oliver Beirne sold all the property he owned in Louisiana to his daughter, Mrs. Von Ahlefeldt, consisting of a number of plantations and other property, for 'the sum of one million dollars, represented by ten promissory notes 'for the sum of one hundred thousand dollars each. In 1888, Mrs. Von Ahlefeldt bought the Houmas plantation, which was formerly the property of Duncan F. Kenner. In a letter written in 1887, addressed to the executors or those whom he had named in his will to be his executors, Oliver Beirne enclosed these ten promissory notes and instructed them to deliver the notes to Mrs. Von Ahlefeldt whenever she deeded the property to his grandchildren, 'the children of William Porcher Miles. On January 25th, 1889, after the death of Oliver Beirne, Mrs. Von Ahlefeldt sold the property conveyed to her by Oliver Beirne to the said grandchildren and received therefor all the notes executed by her as purchaser. This act recites that besides the notes returned, three hundred thousand dollars was the purchase price. In another part of the deed, the right of the vendor in the succession of Oliver Beirne is set forth as additional consideration. This transaction was preceded by an order of court of competent jurisdiction in this State, granted upon the application of the Miles children, with the recommendations of a family meeting, authorizing those of the Miles children who were minors to buy the property. In 1892, the Miles children conveyed all this property, with the exception of that which was situated in New Orleans, to the Miles Planting and Manufacturing Company, Limited. In 1890, the Miles children had previously sold the property in New Orleans to the Tulane Educational Fund.

In the first place, defendant in this suit here filed an exception setting out that plaintiff had no cause or right of action. The judge of the District Court sustained the exception and dismissed the suit, holding that the action was not one for the reduction of a donation *inter vivos,* or *mortis causa,* or an action to set aside the sale of real property as a

donation in disguise. The District Court decreed that the action was revocatory in character, and not *en declaration de simulation* and was prescribed by one year. From this judgment an appeal was taken, and, on appeal, this court reversed the judgment of the lower court and reinstated the case for trial on the merits, holding that the action was entirely distinct from the revocatory action.

On the trial in the court below, after the case had been remanded for its trial on the merits, evidence was heard and the court found that the sales were simulated as relates to the vendor, Oliver Beirne, but that they were real in so far as the vendee, Mrs. Von Ahlefeldt, was concerned, and that they were also real as relates to the Miles children. From this decision, the plaintiffs appeal.

The testimony in the case now before us on appeal discloses that the inventory of the succession of Oliver Beirne, made in West Virginia, embraced the ten notes executed by Mrs. Von Ahlefeldt for the sum of one hundred thousand dollars each, secured by property situated in Louisiana, that the executors of his succession instituted a suit in chancery in that State, contradictorily with the parties in interest, including Susan Beirne Robinson, and that the court of West Virginia ordered the delivery of these notes (the property of the estate of Oliver Beirne) to the children of William Porcher Miles under the terms of the will, and they were delivered in accordance therewith. The evidence further discloses that, in 1888, the executors of the estate of Oliver Beirne brought an action in one of the chancery courts of West Virginia, in order to obtain the court's views in regard to the proper execution of the will of Oliver Beirne. To that suit, Susan Beirne Robinson and Mrs. Von Ahlefeldt were made parties. The petition in this case refers to the notes, and as to them it is alleged that they were executed by Mrs. Von Ahlefeldt, and that they should be surrendered to her on her conveying to the aforesaid executors the Louisiana property named in the mortgage for the benefit of the children of William Porcher Miles, as directed by Oliver Bierne in the codicil to his will. That court also found that the property mortgaged by Mrs. Von Ahlefeldt, in favor of Oliver Beirne, vendor, was worth about six hundred thousand dollars, including the Houmas place, "which was bought and paid for by Oliver Beirne in his life time, but was deeded directly to Mrs. Von Ahlefeldt." The notes before mentioned were handed over to Mrs. Von Ahlefeldt by the court of West Virginia, and were delivered by her to the Miles children. They are referred to in the sale of the

property by Mrs. Von Ahlefeldt to the Miles children as having been cancelled thereby. This deed, between Mrs. Von Ahlefeldt to the Miles children, was dated January 25th, 1889.

In March, 1889, as guardian of Susan Beirne Robinson, Mrs. Von Ahlefeldt, before said court in West Virginia in said case, filed an answer to the chancery proceedings before referred to, stating that the ten notes of one hundred thousand dollars each *had been cancelled and surrendered* to her by proper authority in accordance with the terms of the codicil to the will of Oliver Beirne; and stating further that "the mortgages to secure said notes have been discharged, and that nothing remains to be done by this honorable court in relation thereto; that the respondent does not claim any of the Louisiana property referred to in said bill, otherwise than under a mortgage recently executed by her, which is not affected by, or involved in, the proceedings of this cause. Respondent joins in the prayer of the bill for the construction of the will of Oliver Beirne, as far as relates to the Walnut Grove plantation in West Virginia, and asks that her rights in said property, both present and prospective, may be declared and established."

In March, 1889, an interlocutory decree was signed by the Circuit Cour, for Monroe County, West Virginia, referring the cause to Commissioner M. I. Kester, who was directed to report regarding certain accounts; first, the commissioner was to ascertain all the assets of the estate, real as well as personal, of Oliver Beirne, deceased, showing what part, if any, was in Louisiana. The commissioner made a report in which he refers to the said notes as part of the assets of the succession of Oliver Beirne.

In June, 1889, the Chancery Court decided that Oliver Beirne bound himself in written acts for the care and support of his grand-daughter, Susan Beirne Robinson, and that the estate was so bound that the court deemed part of the *proviso* of the will not to be to her, Susan Beirne Robinson's, interest, and declined to accept it, and declared that the executors of the will had no interest in, or right to, or authority over, the Walnut Grove farm, or to its rents or revenues, and the court also decreed, among other things, that should Nannie Von Ahlefeldt die in the lifetime of Susan Beirne Robinson, and the latter should die unmarried, and without issue, that the said Walnut Grove farm should and would pass in fee simple to the Beirne heirs, and that the report of the commissioner, Kester, to which there was no exception, be confirmed. The case was, afterwards, confirmed on appeal, save in one particular,

not noted for the reason that it has no bearing here. It appears that the alleged owners of the Von Ahlefeldt notes, the Miles children, four of whom were minors, acting through their father by virtue of a decree of the District Court of this State, on the advice of a family meeting, purchased from Mrs. Von Ahlefeldt, the maker of these notes, the property in this State conveyed by the late Oliver Beirne to Mrs. Von Ahlefeldt, and, in addition, the Houmas place adjudicated to Mrs. Von Ahlefeldt at a public sale. The recitals of the deed from Mrs. Von Ahlefeldt to the Miles children recite that the vendor, Mrs. Von Ahlefeldt, was a particular legatee for the sum of two hundred thousand dollars, and the sale was made upon the vendees paying to vendor the sum of three hundred thousand dollars, as follows: one hundred thousand dollars in cash, and two hundred thousand dollars in instalments, "the same to be in full payment of the legacy and all of Mrs. Von Ahlefeldt's interests" in the succession of Oliver Beirne, and of the further consideration of the return by the parties, i. e., the Miles children, of the ten promissory notes for the sum of one hundred thousand dollars each.

It is, also, in proof, as alleged, that the Miles children, purchasers from Mrs. Von Ahlefeldt, conveyed this property (except that part of it situated in New Orleans) to the Miles Planting and Manufacturing Company, Limited. The recited consideration in the deed from the Miles children to the aforesaid company was the sum of five hundred and fifty thousand dollars.

It is in place here to state that the will of Oliver Beirne, to which we have already referred, was filed in the District Court of this city, and on this will the succession was therein opened. The property of the succession was sold; the charges and expenses were deducted and the balance was distributed among the heirs. Susan Robinson was allowed her portion, amounting to about six thousand dollars, which was sent to Mrs. Von Ahlefeldt. The will was probated in 1890, and immediately afterwards this amount was sent to her for the account of Susan Robinson.

The defendants, in the lower court and on appeal to this court, plead res judicata, based upon the will probated in West Virginia, approving the inventory of the property according to the laws of that State, where the testator resided, embracing the ten notes of Mrs. Von Ahlefeldt, which were secured by mortgage and vendor's privilege on property situated in Louisiana, also based on the fact, to which we have already referred, that the executors of Oliver Beirne instituted a proceeding in

552 SUPREME COURT OF LOUISIANA,

Cox et al. vs. Von Ahlefeldt et al.

chancery in the Circuit Court of Monroe County, West Virginia, against all parties concerned, including the Miles children, Susan Beirne Robinson and her father, Henry A. Robinson, who was her guardian up to the time of his death; and on the additional fact that one of the commissioners submitted a statement and finding of the court showing, defendants assert, the disposition made of the ten notes executed by Mrs. Von Ahlefeldt of one hundred thousand dollars each, which recognized them as the property of the Miles children, to whom they were delivered by virtue of the will, the proceedings to which Susan Beirne Robinson was a party and judgment in chancery decreeing these children to be the owners. They aver that all these proceedings are binding on plaintiffs; that they cannot be collaterally attacked; and that they constitute a final proof of the respective rights of the parties. Defendants, in support of this plea, also invoke proceedings in Louisiana, under which authority was given by the District Court of their domicile to those of the Miles children who were minors, to deliver the Von Ahlefeldt notes, which they assert they own as legatees, and accept in place thereof the property transferred by Oliver Beirne to Mrs. Von Ahlefeldt.

There was judgment in the District Court for the defendants and the plaintiffs prosecute this appeal.

## OPINION.

We take up, in the first place, the plea of *res judicata,* as it is the first put before us for consideration. If the notes in question were mere paper promises to pay, because of the alleged simulation, then the action of the court in West Virginia in a cause in which it was not presented, could not give them consideration and validity here as notes secured as to their payment by mortgages on Louisiana property. It does not appear satisfactorily that these notes were within the jurisdiction of the court of West Virginia at the date that the judgment was pronounced, which is pleaded as *res judicata.* We are certain that no such issues as those presented here were ever raised before the court of West Virginia. In the proceedings there, the averments are that the property in Louisiana, at any rate that on which there was a mortgage, was not to be considered. The court in West Virginia passed upon the issues raised by the parties. We do not think that the question of title to the Louisiana property was passed upon at all. In order that this plea of *res judicata* may be of any avail, it must appear that the mat-

ter at issue was decided in the first suit. The incidental mentioning of the notes by the commissioner, Kester, after they had been delivered to the Miles heirs, did not have the effect of investing the court of West Virginia with jurisdiction to determine questions of title to Louisiana property. The *lex rei sitae* must be held to govern.

The immovable property of a non-resident is subject to the laws of the State. C. C. 9. We have not found that any action on the part of the court in West Virginia had the effect of removing the property from the control of that rule. The successions of persons domiciled out of the State must be opened and administered as are those of persons domiciled in the State. This is the jurisprudence, and furthermore it is one of the textual provisions of the Civil Code. C. C. 1120.

Having arrived at the conclusion that the proceedings in West Virginia can have no effect upon the rights of persons to property in Louisiana, we are brought to a consideration of the question of simulation. As revealed by the record, the design of Mr. Oliver Beirne to avoid the Louisiana laws regarding forced heirship begins from the date that he chose to purchase the Walnut Grove plantation from his son-in-law, Henry A. Robinson. We have noted that in this deed he manifested a desire to have his grand-daughter, Susan Beirne Robinson, taken care of and protected during her natural life. He was at the same time evidently, if anything, more solicitous that after his death his property should pass to his other grandchildren, the children of William Porcher Miles. His object is made more evident by the stipulation contained in his deed to his son-in-law, Henry A. Robinson, quoting from the deed, "that Henry A. Robinson reliquishes and releases to said Oliver Beirne and to his heirs, all rights, title, or claim he has or might have by virtue of his being the father and natural guardian of said Susan Robinson." We may as well state in passing that while such a stipulation may be made in West Virginia, it is not valid in Louisiana, being against the policy of her laws to permit heirs to dispose of rights of inheritance. One cannot renounce the estate of a living person. C. C. 1887. *Nemo est haeres viventis.* (Coke Litt. 226.) No one is the heir of a living man.

It follows that though this stipulation may have been valid in West Virginia, it cannot, as a consideration of any sort, have bearing upon any issue involving title to property in Louisiana. As relates to the forced heirship here, the remuneration can have no effect. It must be considered as a *nudum pactum.* Oliver Beirne, after having thus stip-

ulated for his grandchild, Susan Beirne Robinson, constituted his other grandchildren, the Miles children, his universal legatees. They were to become, such was his intention, the beneficiaries of the relinquishment made by Henry A. Robinson in his (testator's) favor. Long prior to the sale noted in our statement of facts, which he made to Mrs. Von Ahlefeldt of all his Louisiana property, he directed her to employ General Miles as her agent. In the first section of his will he declares that he has made provision for the comfortable care and safety of Susan Beirne Robinson. The inference is that he looked upon the provision he had made as ample (as it was when considered as a mere question of fact without regard to law and forced heirship) and that the remainder of his property would be inherited by his other heirs. He made no express mention of the Louisiana property in his will. It is only some time after, about two years, that he directed his executors in a letter addressed to them to deliver the ten notes of one hundred thousand dollars each, made by Mrs. Von Ahlefeldt, asserted purchaser of the Louisiana property, to the Miles children after his death, thereby showing that he had in contemplation the execution of just such a deed as Mrs. Von Ahlefeldt executed when she conveyed the Louisiana property to the Miles children in 1889. He looked forward to the transfer of the property to these children. The conclusion is irresistible that it was with him the moving cause in placing the property in the name of Mrs. Von Ahlefeldt. As relates to him the sale was not real. It was only a paper title made with the view of carrying out his intention regarding his heirs which happened not to be in accord with the laws of this State.

In leaving this branch of the case, we must say that Oliver Beirne only sought to carry out the natural feeling of the father who seeks to transmit his own to the children of his own blood; a feeling fostered by the forced heirship of the civil law which happened to be in the way of his cherished purpose.

The argument presented with force and clearness has not convinced us that the title of Mrs. Von Ahlefeldt, in so far as she is concerned as vendee, was more serious than it was on the part of her father, Oliver Beirne, the vendor. After the sale and the vendee's asserted possession, the guiding hand of the vendor was as active as it was before the sale; not, as we take it, to suggest and advise as becomes the *pater familias*, but to manage and control the property as an owner. At this point, we do not consider it necessary to dwell at length on the facts. The vendee, it may be, thought that she was the owner, that she was in some way

vested with title to the property. Her name, it is true, appeared in deeds and at the head of letters, accounts, and statements. These circumstances, of themselves, did not have the effect of changing the realty of things. She did not pay a cent on the sale. All was on credit. She bound herself to pay a round million of dollars for a number of plantations at a time when her estate amounted to a comparatively small amount. The circumstances do not recommend the sale as serious. Father and daughter cannot thus dispose of property and the disposition hold good against any one having an adverse interest. Salient facts connected with the transfer lead only to the one conclusion, the unreality of the sale. The relationship of the parties, their interests, many of the transactions connected with the possession of the property, its management, the instruction by the vendor regarding the disposition to be made of the notes of Mrs. Von Ahlefeldt (the vendee), concur in proving that she never was the owner. These notes were instruments resorted to, to carry out the purpose of Mr. Beirne, which was to avoid the succession laws of this State, and did not represent a consideration to be paid by the maker. The confidence reposed in the daughter inspired her, in all probability, with the idea that she, being greatly trusted by her father as she was, was an owner. For the purpose of the decision we are not to consider sentiment or family ties, sacred as they are, but the cold rule that requires that all such transfers shall be sustained by valid consideration, which we do not find here. Judged by that rule, the sale is wanting in one of the most important essentials of a sale, that is, the consideration, the price.

We have seen that, in turn, Mrs. Von Ahlefeldt conveyed the property thus placed in her name to the Miles children. We are now brought to a consideration of such rights as these children may have acquired as vendees. We do not understand that they are charged with having taken part in the simulation. The averment as to them is that the interest of Susan Bierne Robinson, as forced heir, having attached to the property prior to the sale of Mrs. Von Ahlefeldt to them (the Miles children), that the sale, in so far as it purported to convey her interest in the property, was the sale "of a thing belonging to another" and, therefore, null. C. C. 2452. Plaintiffs further aver that the purchasers, the Miles children, knew that the conveyance to them embraced the *legitime* of Susan Beirne Robinson, and, in consequence, were in bad faith.

With reference to a recital in the deed under which they owned, and

in a resolution of the Board of Directors of the Miles Planting Company, authorizing the purchase of the property from the Miles heirs, the property is referred to as property inherited from the late Oliver Beirne, and the purchasers do not seem to have taken any pains to have concealed the fact. The expression was faithful to the facts.

Now as relates to the price paid. Part of it, at least, was real. The facts are that Mrs. Von Ahlefeldt would not sell to the Miles children without the three hundred thousand cash. If it went toward the legacy left to her by Beirne and the *legitime* to which she was entitled, it was a payment made in accordance with the terms of the will of the deceased. It was a real and substantial consideration. Furthermore, contradictorily with all the parties concerned, the succession was settled in West Virginia, and the notes in question were delivered to the Miles heirs. Subsequently the will was registered in Louisiana in a court of competent jurisdiction, and again with the consent of all the parties concerned, the possession of the Miles heirs was recognized. The proceedings may be voidable, but they are not void.

The Miles heirs went into possession under a will, and one in possession under a valid will is reputed to be the owner as long as the real proprietor does not set up claim. The co-owner who accepts and consents to his co-heirs and co-legatee going into possession cannot persuasively charge his co-heir with being in bad faith. Le legue de même que la donation est un juiste titre qui est de la nature translative de proprieté qui doit par consequent donner au legataire le droit d'acquerir par prescription la chose qui lui a été delivre acetitre lorsque celui qui le lui delivré n' etait pas propriétaire pourvu que legataire etait de bonne foi. Oeuvre de Pothier (Dupin), Vol. 8, p. 418.

The effect due to the will of Oliver Beirne presents the next ground for consideration. Up to this point, we have not greatly differed from the learned counsel for plaintiffs. But there is no good reason suggested why this will should be entirely ignored. The will, as made, was in nowise void. The only objection that could have been made to it was that it should have been reduced to the disposable portion. The article of the Civil Code on the subject is quite clear and to the point and entirely saves the will from successful attack on the ground of absolute nullity. Article 1502, C. C., sets forth that, "any disposal of property, whether *inter vivos,* or *mortis causa,* exceeding the *quantum* of which a person may legally dispose to the prejudice of the forced heirs, is not null, but only reducible to that *quantum.*"

This, as an abstract proposition, we take it, is not seriously controverted.

Taking up the practical side, plaintiffs' counsel insists that upon the death of Oliver Beirne, Susan Beirne Robinson, as one of the forced heirs, became entitled, as owner, to the forced portion; that under our jurisprudence the legal heirs become seized of the ownership and possession of the property and the rights of their *de cujus*. Counsel quote from the Civil Code an article proclaiming that the heirs are seized of right by the death of the *de cujus* of all the property, and, in consequence, the universal legatee must address himself to the heir for his legacy. C. C. 1607. This is unquestionably true, and is the correct course to pursue in order to obtain possession of a legacy in the possession of the heirs. But if the heirs are not in possession, the legatees are not bound to look to them for the possession which they have not in themselves. It is also true that the heirs are primarily entitled to possession; but if they, for good reasons, are not in possession, and the legatees have the possession of the property in good faith, they are not bound to bring an action to recover a possession which they already have. The Miles heirs are in possession in good faith under the will of Oliver Beirne. We have noted that this will was registered here; property was sold and proceedings had with all parties concerned and the succession was finally settled in this State without the least objection on the part of any one (all the heirs accepted as their portion the amounts allowed by the will) and the Miles heirs were left in possession of the property. They are in possession by order of the court. Without a whisper of opposition from any one, they have each accepted the amount distributed in accordance with the final account. Furthermore, the succession of Oliver Beirne was settled in West Virginia contradictorily with all concerned; not the least objection was urged to the possession of the Miles heirs. A possession thus acquired is surely not one in bad faith. They must be considered as in possession and entitled to all the rights such a possession affords. It is true that *le mort saisit le vif*, but the heir may abandon the right laid down in this maxim. In Succession of Bellock, 29th Ann. 154, to which our attention is directed by counsel for plaintiffs, the possession was entirely *ex parte,* and, in consequence, null and void. There is nothing of this sort here. We are not informed that there is any defect or imperfection in any of the proceedings under which possession was given to the Miles children. If there are any such irregularities, it is settled

in our jurisprudence that one cannot attack them in a collateral proceeding. The defendants, who are also forced heirs, have, in effect, demanded and obtained delivery. Plaintiffs, on the other hand, are not heirs in possession with all the advantages of joint ownership. We do not think that they are entitled to the latter, as the universal legatees are legitimately in possession, as before stated.

The right of heirs, not in possession, to the *legitime,* next arises for consideration and determination.

Plaintiff insists, as we understand it, that whether the heir is in possession, or is out of possession, that the reduction takes place of right, arriving *ex proprio vigore.* Our study of the case has not resulted in our arriving at that conclusion. The heir, in our opinion, must institute an action in reduction as was done in the alternative in this case, and he is bound by all the rules laid down in matter of the indisputable *quantum.* He must deal with an inheritance, and he is not co-owner against whom no prescription can be pleaded. In one of the earliest decisions of the court, Justice Martin said that a donation *mortis causa* in excess of the disposable portion, is not void, but that it is only reducible, and that the donee or legatee does not hold as a co-tenant with the plaintiff. Toten vs. Case, 7th N. S. 261. In another case the court said: "The disposition in her favor was not null, but only reducible to the disposable portion, and whether or not it was reduced or not depended upon the future action of her children." Young vs. Cage, 6th Ann. 414. In Ripoli vs. Morina, 12th Rob. 552, cited by plaintiffs, there was, as we take it, no question of prescription presented. The court did not treat the title conveyed as void. If it had, the following would not have found place, *arguendo* only, in the opinion. "We agree with Toullier, *loco citato,* that all that the law has done in favor of a purchaser in good faith is to give him the benefit of prescription of ten and twenty years though the property so purchased may belong to another person." The question of prescription will be considered hereafter. We only quote, as relates to prescription, in support of the proposition that its application by the court shows that it enters into the question in a claim for property on grounds, in some respects, similar to those now under consideration. Gardner vs. Harbour, 5 M. 408; Carroll vs. Cockerham, 38 La. Ann. 813. In all these cases the heir is held to own an interest in the succession. It is a question of inheritance. It is true that inheritance is a title of

ownership in the succession, but it is none the less subject to the rules governing inheritance. In Tessier vs. Roussel, 41 Ann. 474, it was said: "Every donation, however and whenever made, is, therefore, subject to an implied resolutory condition, binding on the parties thereto and their privies, to the effect that if, at the death of the donor, he shall have forced heirs, and the donation shall prove to be in excess of the disposable portion as then ascertained, the donation will be resolved to the extent of such excess. We have read with close attention all the decisions cited by counsel for plaintiff and the paragraphs of the commentators on the subject. They do not controvert the proposition that the reduction of the donation can be sued for only by the forced heirs."

D'apres le droit commun c'est du reservataires qui protend que sa reserve est entamee qu'incombe la charge d'en faire le preuve. En principe un heritier a reserve ne peut demander la reduction des dons on legs faits a son co-heritier qu'autant qu'il a etablit prealablement par la liquidation de l'actif et du passif de la succession que ces dons on legs excedent la quotité disponible.      Laurent, t. 12, No. 145; Baudry-Lacantinerie, t. 2, No. 430.

The proof of excessive donation is with the forced heir. He, in law, can not ignore the will, take possession despite the adverse possession of another and insist on being considered as a joint owner.

The Cox vs. VonAhlefeldt case is cited *supra* several times as sustaining all the propositions of law at issue, and consequently (in that view) that it sustains the proposition that the forced heirs are entitled to every piece of property as owners to the extent of the *legitime*. We have weighed every sentence of the opinion. It holds that children can not be deprived, by their parents, of that portion of the estate which the law reserves for them, conveying the idea of ownership. After discussing the subject at some length, the court says: "whether or not forced heirship is ownership in its fullest sense, or whether the forced heir is not within the rule *le mort saisit le vif,* seems to us a discussion not at all calculated to aid the defendant's case. It is quite certain that the right of action of the forced heir for his *legitime* springs into existence with the death that calls the heir to the succession. The incontestable right of the forced heir of Mr. Bierne the plaintiffs seek to exercise, and that other question, whether the plaintiffs, as collateral heirs of the forced heirs, are clothed with her rights, remain for examination." The question was left open for future consideration. The last paragraph of the *syllabus* written by our most worthy associate, the

late Justice Miller, who was the organ of the court, as we take it, throws light upon the views of the court. We think, as expressed in the opinion, that the forced heir can not be deprived of his *legitime* by the donation or simular disposition of the deceased Bierne, and that the suit is "not the revocatory action," but one of reduction or revendication to recover the *legitime*.

D'abord il est constant que la detraction de la *legitime* ne doit etre faite qua pres toutes les dettes et les frais funeraises payes. La loi 8, Sec. 9, D. de *inofficiosi testamento* ne laisse la desus aucun doute.

Merlin, p. 7, Vol. 7.

We conclude this branch of the case with the statement that the legal remedy of the heirs of Susan Bierne Robinson is by an action of reduction, such as brought by them in the alternative, but here they are met by defendants' plea of prescription of five years. *L'action en reduction est prescriptible.* Baudry, p. 309.

Plaintiffs insist that the question of prescription is taken out of the case by the former decision of this court. If prescription was suspended by the imbecility of the heir from whom plaintiffs inherited, without interdiction, the five years have not elapsed. If it was not suspended, then the prescription pleaded operates as a bar. As relates to the facts, it is admitted that this heir was an imbecile from her birth to the date of her death. In the decision cited, the court said: "The pleas of prescription are met by the allegations of the insanity of the grandchild, and if these allegations are true, there was a suspending of prescription." The opinion did not deal with the facts before the court, nor were opinions expressed regarding the subject such as to leave no doubt of the intention to deal with the question finally, and to express views not to be reconsidered in the case. The decree remanded the case to be tried on the merits. Moreover, it is the decree which governs and not the opinion. Plaintiffs earnestly press upon our attention the rule *contra non volentem agere non currit prescriptio* and cite a number of decisions in which effect was given to it. True, it has been held that an administrator can not sue a succession he represents and to that extent the rule just cited was sustained. It will be observed that the decision was grounded on the fact that the administrator positively could not sue. In another of the cited cases, it was decided that one can not defeat the rights of another by rendering it impossible to sue him by concealing himself. In all the cases cited, the principles of suspension of prescription rested on the idea that suit to interrupt pre-

scription was impossible for the reasons before stated or others similar. We have not found a decision in which it was held that insanity or imbecility was a good ground to suspend prescription. A suit in the name of Susan Beirne Robinson would have interrupted prescription. For that purpose, it would have been sustained. She was a person in law and that is all sufficient, as relates to a suit to interrupt prescription. There are courts in other jurisdictions which have gone much farther and held that a judgment or decree against an insane person who is properly brought before the court is valid and binding, and neither void, nor voidable. The following is the Article of the Civil Code we are called upon to interpret: "Prescription runs against all persons unless they are included in some of the exceptions established by law." Article 3521. We have seen that the afflicted person was one who could sue; she was not interdicted, and for that reason her case does not come under the protection of an article adopted for the protection of minors and interdicts. Plaintiffs urge that, although this heir was not interdicted, her mental condition was passed upon by the court and this is equivalent to an interdiction. Under the laws of West Virginia, interdiction must be pronounced, as under the laws of Louisiana. To sustain this position would be giving legal effect to facts without regard to form, in the face of the laws' declaration that prescription runs against all persons except interdicts and minors.

The Supreme Court said in Hansell vs. Hansell, 44 Ann. 548, that the courts of this State must deal with an absent insane person domiciled elsewhere as a sane person until the courts of his domicile have *interdicted him.*

The following actions are prescribed by five years: "That for the nullity and rescission of contracts, testaments, or other acts. That for the reduction of excessive donations." C. C. 3541. Without an authority bearing directly upon the subject to sustain a different conclusion, in view of the Article of the Civil Code, our decision is that prescription is suspended. One of the uncles and heirs of Susan Beirne Robinson died in November, 1894, after the death of Susan Beirne Robinson, leaving as his heir two minor children, Eppes and Gwin Robinson, represented by their guardian Lizzie P. Robinson. They being minors, under the letter of the law, prescription was suspended from the date of the death of their father until this suit was brought by their guardian. As to these minors, the five years had not elapsed. They, in consequence, are entitled to one-sixth of the *legitime* of Susan Beirne Robinson.

Recurring to the question of suspension of prescription, plaintiffs object, as relates to this particular issue, for the reason, as they argue through counsel, that the right to reduce is necessarily in suspension until the simulation invoked by them is decreed, and that until then no question of prescription can arise. In answer we deem it proper to state that if the sale is simulated, the ownership of the testator's succession is reinstated the same as if there had been no sale. The will is in evidence showing the interest of the heirs and legatees to the property. The evidence does not connect the Miles children with any simulation. As relates to the property or their rights to it, they have not been forfeited by claiming the property they bought and on which they paid a large amount. We are not of the opinion that the defense made by the Miles heirs precluded the plea of prescription. Plaintiffs also urge that there was fraud and that, in case of fraud, prescription alone runs from the date of the discovery of the fraud. We think that this is met by the statement that there was nothing in the nature of fraud in matter of the will under which all concerned received benefit. The Miles heirs had naught to do with the concealment of the facts. We have seen that they were third persons not connected with the simulation. The deeds were of record. The failure to attack them in time is not due to any act of these heirs, but to the fact, as we take it, that plaintiffs were not aware of their rights under the laws of Louisiana which are different, as relates to inheritance, from those of the State in which the estate was domiciled and in which plaintiffs reside. Plaintiffs also contend that the question of ownership under the will is not at issue. We do not think that this contention of counsel for plaintiffs presents ground enough to remand or dismiss the case in order that this new issue may be raised.

Plaintiffs and defendants have introduced all evidence necessary in rendering a decision. Plaintiffs made the will a part of their petition. We therefore pass on the rights of the parties thereunder. The proceedings in this State, on the will, are before the court and all the points connected therewith have been exhaustively argued and considered.

Defendants, on the other hand, urge that the case should be dismissed because plaintiffs have not chosen to bring a direct action attacking the will and claiming the *legitime*.

We appreciate the force of the position. None the less, believing that it is in the interest of all concerned that this litigation be brought to a close, we have passed upon the issues presented by the record and

the evidence. We would not dismiss the case in any event, as the right made evident would require that it be remanded and not dismissed. The result would be, in the former case, that it would be brought back on appeal on precisely the same issues as are now presented by the evidence, if not by the pleadings.                    .    ,

These are our conclusions, arrived at after carefully thinking over all the questions presented. Several are of the highest importance and have direct bearing on the social order. If a rehearing be applied for, we will reconsider these questions, and give the several points more than usual consideration.

It is therefore ordered, adjudged and decreed that as to Mrs. Margaret R. Cox, Edwin P. Robinson, Walter H. Robinson and Francis V. Robinson, the decree of the District Court is affirmed.

It is further ordered, adjudged and decreed that as to the minor children of Samuel A. Robinson, before mentioned, it is avoided, annulled and reversed; and

It is now ordered, adjudged and decreed that they, the said children, do hereby have judgment against and recovery of the defendants for one twenty-seventh (1-27) of the whole property in question, and they are further recognized as entitled to an accounting of the rents and revenues of said property from said defendants from the date this suit was filed and that the case be remanded to the District Court for the accounting by the said defendants for the rents and revenues from said date.

Defendants, as relates to the interest of the minor children named, are to pay the costs of both courts. Appellee is to pay the costs of appeal.

Mr. CHIEF JUSTICE NICHOLLS. I concur in the decree so far as it affirms the judgment of the District Court, and dissent in so far as it amends that judgment.

WATKINS and BLANCHARD, J. J., concur in the above in so far as the same reverses the judgment of the District Court, and dissent from same in so far as it affirms the said judgment.

WATKINS, J., hands down a separate opinion expressive of the reasons for his dissent, BLANCAHRD, J., concurring in this dissent.

## ON REHEARING.

MONROE, J. The facts of this case will be restated for convenience of reference, in connection with the opinion which follows:

In 1882, Oliver Beirne was recognized as the universal legatee of John Burnside, and, in that capacity, was put in possession of a number of sugar plantations and other property in Louisiana, the value of which may be roughly stated at $500,000. If Mr. Beirne had then died intestate, the property so acquired, together with certain property on Bourbon street, in New Orleans, of which he was already the owner, would have fallen to his daughter Mrs. Von Ahlefeldt; to Susan Beirne Robinson, only child of his daughter Susan, deceased wife of Henry Robinson; and to the six children of his daughter Elizabeth, deceased wife of Wm. Porcher Miles, in the proportion of one-third to Mrs. Von Ahlefeldt, one-third to Susan Beirne Robinson, and one-third to the Miles children. And, whether he died testate or intestate, the persons mentioned above were his forced heirs to the extent of two-ninths of said property to each branch. Mrs. Von Ahlefeldt was, however, a widow, without children, and Susan Beirne Robinson was a child, about eleven years of age, who had been a hopeless mental and physical imbecile from her birth, and was, therefore, incapable of enjoying a large inheritance, but was likely soon to die and to leave any property which she might acquire to her father, or, in the event of his death, to her aunts and uncles, of whom five were upon the paternal side, and but one, Mrs. Von Ahlefeldt, was upon the maternal side. So that the Miles children were the only persons who were capable of both enjoying the fortune of Mr. Beirne and of handing it down to a common posterity. Such being the situation, Mr. Beirne, who had his own home, together with large interests, in West Virginia, placed his son-in-law, Wm. Porcher Miles, in charge of his Louisiana estate, and that gentleman established thereon a home for himself and his children. Thereafter, in August, 1885, Mr. Beirne entered into a contract with his other son-in-law, Henry Robinson, whereby he agreed to pay him $100,000, in cash, and to provide for his imbecile daughter, Susan Beirne Robinson, during her life; in consideration whereof, Robinson relinquished the guardianship of the child, and sold to Beirne a certain farm, known as "Walnut Grove," and further agreed and stipulated as follows, to-wit:

"And for and in consideration of the sum above expressed he, for himself, his heirs and executors, hereby sells, conveys, and relinquishes to Oliver Beirne, and to his heirs and executors all right, title, or claim that he now has, or may hereafter have by his being the father of Susan Robinson, who is also the granddaughter of said Oliver

Beirne, to any and all property, both real and personal and mixed, wherever situated, including all real and personal property heretofore described; but especially that real estate and personal property and choses in action in the respective States of Louisiana and West Virginia. It being intended that if said Oliver Beirne should die before the party of the first part, the said Henry Robinson, or the said Susan Robinson, then, in that event, said Henry Robinson hereby relinquishes and releases to said Oliver Beirne, and to his heirs, all right, title or claim he has, or might have, by virtue of being the father and natural guardian of said Susan Robinson."

It is shown that this contract was executed in so far as it was capable of being executed at that time; that is to say; Oliver Beirne assumed the care of his imbecile grand-daughter; took possession of Walnut Grove; and paid over to Henry Robinson the $100,000 as agreed on; and Henry Robinson surrendered the child and the farm, and went elsewhere to live upon the income of the money which he thus received. It is also shown that Walnut Grove Farm had been given by Oliver Beirne to his daughter, Mrs. Robinson, in 1868; that, in 1869, Mrs. Robinson had made a will leaving all of her property to Henry Robinson, her husband; that, upon January 25, 1871, she gave birth to Susan Beirne Robinson, and that, upon February 1st following, she died. It further appears that, under the law of West Virginia, the effect of the birth of the child, after the making of the will, was such, that the will was thenceforth to be construed as though the devise to Henry Robinson had been limited, by its own terms, to take effect only upon the death of said child, unmarried and without issue. Under the same law, however, Robinson's "curtesy" in the estate of his wife entitled him to a free hold in the land left by her, so that the interest actually acquired by Beirne was the right to use and occupy the property during the life of Robinson, with a fee simple interest, to himself and to his heirs, contingent upon Susan Beirne Robinson dying unmarried and without issue.

The next step taken by Mr. Beirne in the arrangement of his affairs, was to make his will, which he did upon December 26, 1885. In that instrument, he says: "First, I have recently purchased from Major Henry Robinson what interest he had in the property known as the "Walnut Grove," * * * for which I paid him, in cash, $100,000, much more than the property was worth. The consideration being that he relinquished all further claim to my estate that he might have

through his daughter, Susie Robinson, who is a hopeless imbecile, and, at the same time, turned·over to me the said Susie Robinson to be cared for by me, or my representatives, during her natural life." Then follow certain dispositions whereby the testator sets apart Walnut Grove Farm and devotes the revenues thereof, or as much as may be necessary, to the support of Susie Robinson; following which are various particular legacies, and among them one of $300,000 to his wife, and one of $200,- 000 to Mrs. Von Ahlefeldt; after which the testator proceeds as follows:

"Fifth. I make my grandchildren, the children of Wm. Porcher Miles and his deceased wife, Elizabeth, my beloved daughter, the residuary legatees of my estate, share and share alike, after the first, fourth, second and third sections of this my will are provided for, then the remainder of my estate to be paid over to the residuary legatees, or divided equally amongst them when the youngest shall have attained the age of twenty-one."

Then follow certain directions which are unimportant here; a clause naming his son-in-law, Wm. Porcher Miles, Hugh Caperton and William Gaston Caperton, as his executors, another dispensing said executors from furnishing bond; the signature of the testator, and the date, after which is the following:

"Codicil. I have paid my son-in-law, Wm. Porcher Miles, for attending to my business in Louisiana, $5000 per annum, and I recommend my daughter to continue the said amount to the said Miles, and I would further advise its continuance until the estate is finally wound up in accordance with this will."

(Signed) "OLIVER BEIRNE. Date as above."

Upon January 21st, 1886, a little less than four weeks after the making of this will, Mr. Beirne executed a deed purporting to convey to Mrs. Von Ahlefeldt all the immovable property which he owned in Louisiana, with the exception of that on Bourbon street in New Orleans, for the sum of $1,000,000, represented by ten promissory notes, of $100,000 each, payable, two at a time, in from one to five years, with interest at the rate of four per cent per annum from date until paid, and secured by mortgage on the property. Mrs. Von Ahlefeldt, as has been stated, was a widow lady. She had been twice married, and had no children,·and the record authorizes the statement that

she was without knowledge or experience of sugar planting or other business, and, practically, without capital. It is true that she owned some grazing land in West Virginia, which was worth about $15,000, but which yielded no revenue. And she testifies that she had an interest, valued by her, in vague terms, at about $30,000, in the estate of her deceased husband; but we infer that the estate in question is an unsettled one, possibly in Germany, and that the asset is entirely unavailable for business purposes. Upon the other hand, the sugar planting business, in which she apparently embarked, requires both knowledge and experience for its successful prosecution, and the evidence shows that, in this particular instance, it required a cash disbursement of over $500,000 between the date of Mrs. Von Ahlefeldt's supposed purchase and the close of the season, when the first sugar from the crop of 1886 was ready for the market. So that, in addition to the obligation of paying, in principal and interest, the sum of $208,000, at the *end* of twelve months, on account of the purchase price of the property, she assumed the further obligation of paying not less than $500,-000, *within* the twelve months, to defray the necessary running expenses of the plantations which she had apparently acquired. There has been no attempt to show that Mrs. Von Ahlefeldt, at any time, concerned herself upon the subject of these obligations, or made any provision to meet them. She had no money, she borrowed none, and none was borrowed in her name, and yet, between the date of the supposed purchase and the date at which the property, which was the subject thereof, could have yielded any return, more than $500,000 was required to be expended in its administration. And it was so expended by Oliver Beirne for the most part in Oliver Beirne's name and entirely without cost to Mrs. Von Ahlefeldt. No change in the management of the property followed the execution of the act of sale. The same employees, without even the formality of re-employment, were retained, at the same salaries; and they used the same books for the purposes of the business, which continued to be conducted under Oliver Beirne's direction.

During the four months immediately succeeding the supposed sale, the business was conducted entirely in Beirne's name, and nearly $250,-000 was paid out, by his checks, for the expenses of the plantations, and for his personal account, indifferently, without charge to Mrs. Von Ahlefeldt. At the end of four months, in the latter part of May, there was a balance of $24,369.62 standing to the credit of Oliver

Beirne's bank account, and for that exact amount he drew a check which he deposited to the credit of Mrs. Von Ahlefeldt, thereby, for the first time, opening an account in her name. Subsequently, two other deposits having been made to the credit of Mr. Beirne, the aggregate amount of the same was also transferred to the newly opened account of Mrs. Von Ahlefeldt, with the explanatory memorandum on the check book: "This amount transferred to Mrs. Von Ahlefeldt's account in the Mutual National Bank. No entry to be made as it is only a transfer." And, thereafter, an effort was made to conduct the business in the name of Mrs. Von Ahlefeldt. But, thereafter, as before, the expense of the plantations and those which were personal to Oliver Beirne were paid, indifferently, from the same fund, which fund was supplied from rents collected for the individual account of Oliver Beirne; from the proceeds of the sales of land owned by him, in Texas; from the proceeds of the sales of his drafts on New York; and from other money furnished by him, between May and November, 1886, to the amount of $280,000. And, if Mrs. Von Ahlefeldt did not appear in the matter of furnishing the money which was placed in the bank to her credit, equally is it true that she did not appear as an individual beneficiary in the matter of its disbursement. The books show that, from the account kept in her name, Mr. Beirne drew what money he needed; as for taxes on his individual property; for the price of pictures presented by him to the steamboat "Oliver Beirne;" for the laying of carpets at his residence; for paying his wife's bills; for carriage hire; for physicians bills; for a balance due to one Stewart on a legacy left him by John Burnside, etc., etc.; and they also show that by his authority the Miles family was liberally supplied from the same account. But they do not show that one dollar was ever drawn out by Mrs. Von Ahlefeldt, or was ever remitted to her, or paid out under her instructions, or for her account, save in so far as the disbursements for the plantations are to be so considered. And this applies not only to the period between the date of the alleged sale, January 21st, 1886, and the end of the year, but to the whole period, up to January 25th, 1889, of her supposed ownership of the property; during which time no account was ever furnished to her of the business carried on in her name, and it is doubtful if she was ever in the office from which that business was directed. Her unconcern upon the subject of the enormous amount of money required to operate the plantations of which she appeared to be the owner, and of her outstanding notes, given in payment of the

purchase price of these plantations, was, however, no greater than was that of her father, who furnished the money required, and who held the notes in question. He never seemed to think that there was any reason for concern upon the part of either of them. On the contrary, when the first two notes, amounting in principal and interest, to $208,-000, were about falling due, he executed the following instrument, which was subsequently probated as part of his will, to-wit:

> "Office of Oliver Beirne,
> "No. 33 North Peters Street,
> New Orleans, January 20, 1887.

*"To the Executors of my will—*

"Enclosed you will find ten notes, of $100,000 each, of Nannie Von Ahlefeldt, executed for and in consideration of my Louisiana property. Whenever the said Nannie Von Ahlefeldt shall deed you the Louisiana property for the benefit of my grandchildren, the children of Wm. Porcher Miles, they will deliver you, Nannie Von Ahlefeldt, the enclosed notes.

> "Very truly yours,
>
> "OLIVER BEIRNE."

This testamentary letter was written in the office where the business of the "Louisiana property" was transacted, and the rent of which was paid by checks drawn in the name of Mrs. Von Ahlefeldt; and yet, as will be seen, it was styled the "Office of Oliver Beirne." During the year 1887, matters went on as they had always done, the only possible connection between Mrs. Von Ahlefeldt and the business of the estate which Oliver Beirne had acquired from John Burnside being the use of her name. She knew nothing about that business and made no effort to learn. In March, 1888, Mr. Eustis, who was immediately in charge, turned over to Mr. Beirne, by the latter's instructions, the sum of $66,000, which was accounted for by the memorandum on the check book, *"no entry necessary, as it is only a transfer."* With this money, Mr. Beirne purchased, at sheriff's sale, another large sugar plantation, the title to which he had made in the name of Mrs. Von Ahlefeldt. although, aside from her unmatured obligations, amounting with interest, to about $650,000, he then held her notes, past due and wholly unpaid, amounting, with interest, to $432,000. Mrs. Von Ahlefeldt does not seem to have been consulted about this purchase until after it

was made, when, according to her testimony, being informed by Mr. Beirne that it was a good investment, she gave it her approval.

Upon April 21st, 1888, Oliver Beirne died, and, upon April 27th, following, his will was admitted to probate in the Circuit Court of Monroe County, West Virginia, as was, also, a little later, the testamentary letter hereinbefore referred to. The Messrs Caperton, who lived in West Virginia, and who, with W. P. Miles, had been named as executors, duly qualified as such and proceeded to the discharge of their duties. In August, 1888, they filed a bill, in the said Circuit Court, setting forth, in detail, the provisions of the will of their testator and praying the court to give directions for carrying the same into effect. To this proceeding Mrs. Beirne, the widow of Oliver Beirne, Mrs. Von Ahlefeldt, the Miles children, Henry Robinson, Susan Beirne Robinson, and other legatees, were made parties. In March, 1889, the matter was referred to a commissioner, with instructions; (1) to report as to the character of the assets and where situated; (2) to settle the accounts of the executors; (3) to convene the creditors and report as to their claims; (4) to ascertain the amount necessary for the support of Susan Beirne Robinson, the amount already expended on that account since the death of Oliver Beirne, and since the death of Henry Robinson, and by whom expended; and (on motion of Mrs. Von Ahlefeldt) to ascertain and report; (1) whether Oliver Beirne was in possession of Walnut Grove at the time of his death and, if so, whether he had it well stocked with cattle; (2) the average annual income derived therefrom, as conducted by said Beirne; (3) the date of the death of Mrs. Robinson and of Henry Robinson, and of the birth of Susan Beirne Robinson; (4) whether Oliver Beirne was ever legally appointed guardian of Susan Beirne Robinson; (5) whether Susan Beirne Robinson was an imbecile at the date of the conveyance from Henry Robinson to Oliver Beirne, and whether such imbecility is permanent.

And, the commissioner having made his report, there was judgment, June 6th, 1889, to the following effect, to-wit:

"1. That, by his contract with Henry Robinson, of August 12th, 1885, Oliver Beirne had bound himself for the support of Susan Beirne Robinson during her life, and that his estate remained so bound; and hence, that the particular provisions upon the subject of such support, as contained in the will, should be declined inasmuch as the estate of said Oliver Beirne had no interest in Walnut Grove, the property

TERM OF 1900-1901. 571

Cox et al. vs. Von Ahlefeldt et al.

dealt with in those provisions. The judgment then proceeds to hold that Oliver Beirne's executors should dispose of the personal property at Walnut Grove as they would of any other property belonging to the estate of their testator; that the should annually pay such sum as might be necessary for the support of Susan Beirne Robinson; that should Susan Beirne Robinson die unmarried and without issue, and Mrs. Ahlefeldt survive, the latter should take Walnut Grove, in fee simple; and that should Mrs. Ahlefeldt not survive, Walnut Grove should go, in fee simple, to the heirs of Oliver Beirne.

In this litigation, Susan Beirne Robinson was represented by Mrs. Von Ahlefeldt, as *guardian,* and the decree of the Circuit Court was affirmed by the Supreme Court in April, 1890, with a correction which is not material here.

Beirne's Executors vs. Beirne *et als.,* 33 W. V. 663.

In the meantime, and whilst said suit was pending, the executors had proceeded with the settlement of the estate, with respect to some matters which were not involved in said suit, and had turned over to the Miles children the ten notes signed by Mrs. Von Ahlefeldt. Thereupon, considerable negotiation ensued between the parties mentioned, for the purposes of which the property in Louisiana, standing in the name of Mrs. Ahlefeldt, and including the plantation which had been purchased by Mr. Beirne, was appraised by Mr. Eustis, who valued the plantations at $462,000, to which was to be added the value of the residence in New Orleans, bringing the total estimate to about $500,-000. Eventually, and apparently by means of concessions on the part of the Miles heirs, an agreement was arrived at, and reduced to the form of an authentic act, whereby Mrs. Von Ahlefeldt conveyed to the said heirs the whole of the property covered by the deed from Oliver Beirne to her, as also the plantation subsequently bought in her name, upon the terms and for the consideration as expressed in the following recital, to-wit:

"Whereas the parties of the first part are heirs and residuary legatees of Oliver Beirne, * * * and whereas, as such residuary legatees, they are the owners of ten promissory notes made * * * by Mrs. Nannie Von Ahlefeldt * * * each for * * * $100,000; and whereas, the said Mrs. Nannie Von Ahlefeldt is a particular legatee of the said Oliver Beirne * * * in the sum of $200,000, and has proposed to said parties of the first part to grant, bargain, sell and convey

to them, the real estate and improvements hereinafter described, in the State of Louisiana, upon their paying to her the sum of $300,000, as follows, to-wit: $100,000, in cash, at the signing and delivery of these presents, and $200,000 in five equal instalments of $40,000 each, at one, two, three, four and five years, with interest thereon at five per cent. per annum, payable annually, but with the right on the part of the makers of paying any and all of said notes before maturity, in capital and interest accrued to the date of payment, the (same) to be in full payment and discharge of said legacy and of all her rights in the succession of said Oliver Beirne; said instalments to be a special mortgage and vendor's privilege; and upon the further condition and consideration of the return by the parties of the first part to the party of the second part of her ten promissory notes of $100,000 each duly cancelled."

\*          \*          \*          \*          \*          \*          \*          \*

"And whereas the said parties of the first part have accepted said propositions of the said party of the second part, now, therefore, in consideration of the premises, the said Mrs. Nannie Von Ahlefeldt does hereby grant," etc., etc., (describing the property).

\*          \*          \*          \*          \*          \*          \*          \*

"It is hereby distinctly agreed and understood between the parties that the sale and assignment herein made of the interest and rights of the said Nannie Von Ahlefeldt in the succession of the said late Oliver Beirne does not embrace her interest in the said estate in Monroe County, West Virginia, and known as Walnut Grove, which was devised to the said Nannie Von Ahlefeldt by the will of the said Oliver Beirne, the interest of the said Nannie Von Ahlefeldt in the said Walnut Grove being hereby excepted from the operation of these presents."

This instrument bears date January 25th, 1889, at which season, as when the deed from Oliver Beirne to Mrs. Von Ahlefeldt was executed, the year's crop had been made, and the larger portion of the sugar which had been obtained therefrom was no doubt on the market. Certainly no part of it was included in the sale; and yet from the proceeds of that crop, which, according to the theory of the defense, belonged to Mrs. Von Ahlefeldt, there was paid: Oliver Beirne's funeral expenses; the $100,000 which the contract above referred to required should be paid to Mrs. Von Ahlefeldt, herself, a further sum of $100,000 on

account of the legacy of $300,000 left by Oliver Beirne to his wife; and, finally, the balance of $36,325.69 in bank, to the credit of Mrs. Von Ahlefeldt, was drawn out by a check for that exact amount, payable to the order of "W. P. Miles, tutor and agent," upon the stub of which was entered the following memorandum, to-wit: *"This amount transferred to account of W. P. Miles, agent and tutor; no entry necessary as it is only a transfer."* At about the same time that Mrs. Von Ahlefeldt's bank account was thus closed and her ostensible connection with the Louisiana property and business terminated, to-wit: about February 7th, 1889, the Succession of Oliver Beirne was opened in New Orleans, and, although the record has been lost, it is satisfactorily established that the following action was taken, to-wit: a petition was filed, in accordance with the prayer of which the will was ordered to be recorded, and Wm. Porcher Miles was confirmed as executor; an inventory was taken, showing the Bourbon street property valued at $17,000; cash in bank $544.80; and household furniture, paintings, etc., valued at $12,449.50, or a total of $39,994.30 of property in the Parish of Orleans, and purporting to be all the property belonging to the succession in the State of Louisiana; the movable and immovable property thus inventoried was sold by order of court (the real estate having been adjudicated to Mrs. Von Ahlefeldt for $21,-000 cash), and the executor, thereafter, in 1890, filed an account, whereon Susan Beirne Robinson was recognized as the forced heir of her grandfather with respect to the proceeds of the property so inventoried and sold, and said account was duly homologated, and the money in the hands of the executor was ordered to be distributed in accordance therewith; and it was so distributed, the share of Susan Beirne Robinson, amounting to $6848.97, having been forwarded to her guardian, Mrs. Von Ahlefeldt, in West Virginia. It does not appear that the executor was ever discharged.

In November, 1890, the Miles children sold to the Board of Administrators of the Tulane Educational Fund, the New Orleans residence which Mr. Beirne had acquired as part of the Burnside estate, and which had been included in the supposed transfer to Mrs. Von Ahlefeldt, but which, nevertheless, he had continued to occupy, rent free, until the day of his death, whilst the taxes and cost of maintenance were paid by checks drawn against funds deposited in the name and to the credit of Mrs. Von Ahlefeldt.

Thereafter, in 1892, the Miles heirs organized a corporation under

the name of "The Miles Planting and Manufacturing Company, Limited," and fixed the capital stock at $542,000, divided into 542 shares of $1000 each, of which each of the six heirs took ninety shares and Wm. Porcher Miles and Henry C. Eustis, each, took one share.

The board of directors of the company, composed of Wm. Porcher Miles, Henry C. Eustis, Wm. Porcher Miles, Jr., Betty Miles and Sally Beirne Miles, in April, 1892, adopted a resolution reading as follows: "Resolved, That this company do purchase all the property inherited by Wm. Porcher Miles, Jr., Misses Sally Beirne Miles, Betty Beirne Miles, Nanny Miles, Susan Warley Miles, and Margaret Melinda Miles, from their late grandfather, Oliver Beirne, Esq., and from Wm. Porcher Miles, all of said property fully described and set forth in the descriptive list now before the board," etc. This was followed by an act of sale from the heirs to the company, in which, after a description of the property, there appears the following, to-wit: "All being the property inherited by the vendors from the estate of their deceased grandfather Oliver Beirne, Esq." To conclude the recapitulation of the facts upon this branch of the case, it may be said that Mrs. Von Ahlefeldt having been paid, in the manner as stated, the $100,000 in cash called for by her contract, has since then been paid the full amount of the legacy of $200,000 which, by the terms of said contract, was to be paid in instalments, and it may also be said that the administration of Oliver Beirne's estate in West Virginia was closed and his executors, there appointed, were discharged in March, 1896.

Turning to some other matters which, it is claimed, bear upon the questions at issue; Henry Robinson died in October, 1888, and left a will whereby he bequeathed his whole estate, save a few legacies of trifling value, to his sister and brothers, and they received the property so bequeathed and consented to the discharge of the executor, in 1892. The evidence shows that the property in question consisted, almost exclusively, of securities which had been purchased by Henry Robinson with the $100,000 that he had received from Oliver Beirne, and that Walnut Grove Farm represented about one-half, in value, of said $100,000, so that the balance of said amount was money which had been paid to him for the relinquishment of his prospective claims, as the heir of his daughter, against the estate of Oliver Beirne. Susan Beirne Robinson, as has been stated, was born in January, 1871, and therefore attained her majority in January, 1892. Oliver Beirne was

never appointed her guardian; but, prior to the fall of 1888, that office seems to have been held by Hugh Caperton, who resigned at the October term of the Circuit Court, and, thereafter, in November, 1888, Mrs. Von Ahlefeldt was appointed in his place, and gave bond in the sum of $15,000. Later on, March, 1891, Mrs. Von Ahlefeldt presented a petition to the court invoking action upon her accounts as guardian; asking for directions as to her future conduct, and particularly asking that she be allowed to become the lessee of Walnut Grove Farm, which belonged to her ward. In the course of her petition, she alleged that her ward was a "sufferer from an incurable imbecility of mind and body," and she prayed that the court would "undertake the supervision and direction of the plaintiff, as guardian, and give her all proper instructions and directions in her duties as such, and that her accounts as such be annually settled and reported in this court," etc. Agreeably to this prayer, the court ordered that the petitioner be permitted to take possession of Walnut Grove "as a renter, from year to year, from the 1st day of November, 1891, at the annual rent of $900, less the taxes upon the said farm," etc., and that "the said guardian shall make annual statements," etc. Mrs. Von Ahlefeldt continued to act as guardian of Susan Beirne Robinson after her majority, and until her death, which took place January 4th, 1894, when she turned over the balance of assets in her hands to an administrator duly appointed.

The record does not, however, show that the attention of the court was attracted to the fact that Susan Beirne Robinson was about to attain, or had attained, her majority, and that she should be interdicted, as required by the law of West Virginia, or that any appointment was made after that event and after notice served upon her. The case, therefore, stands as though a tutor in Louisiana had continued in the tutorship of an imbecile ward after the latter had attained majority, without regard to that fact, and without causing such ward to be interdicted, and the question whether prescription runs in such a case is to be determined upon that basis.

It is only necessary to add, in this connection, that the distributive share from the Louisiana succession which was received by Mrs. Von Ahlefeldt, for account of Susan Beirne Robinson, was eventually turned over by her to Allen Caperton, administrator of Susan Beirne Robinson, and constituted the greater part of the latter's estate; and that said estate was duly administered and distributed, the plaintiffs,

represented by one of their present counsel, who practices in the courts of Monroe County, West Virginia, receiving one-half thereof; that two of the present plaintiffs are minors, children of Samuel A. Robinson, an uncle of Susan Beirne Robinson, who died in November, 1894; and that this suit was filed in April, 1897.

## OPINION.

This case came up originally upon an appeal from a judgment maintaining an exception of no cause of action and a plea of prescription of one year, and the judgment appealed from was reversed and the case was remanded, with instructions that the plaintiffs be heard upon the merits. *Cox et als. vs. Von Ahlefeldt et als.,* 50 Ann. 1266.

For the purposes of the decision thus referred to, it was held by this court that the plaintiffs, as collateral heirs of Oliver Beirne's forced heir, Susan Beirne Robinson, succeeded to her rights, and have, therefore, the same right to prosecute this suit that she would have had if she had lived.

This proposition, we now reaffirm. True it is that the Spanish law, as it existed in Louisiana when the territorial government was organized, only went so far in its terms as to authorize the descendents and ascendents of the testator to bring what was called the *querella inofficiosi testamenti,* or action to annul the will upon the ground of its being "contrary to the paternal affection and regard which the father ought to have for his child," or which the child ought to have for the father. *Partida Sixth, Tit VIII, Law 1.* And if the law makers to whom we are indebted for the Civil Code had thought it advisable, they would, no doubt, have left the law as it was written in the Partida. But they did not leave it so. On the contrary, they framed the law by which we are governed in language which expressly authorizes the bringing of the action to reduce the donations of the testator within the disposable *quantum "by forced heirs, or by their heirs or assigns."* C. C. 1504. And in this respect, the Civil Code differs also from the Code Napoleon, which authorizes the bringing of such action by the forced heirs, or *"par leurs heritiers ou ayants cause"* the term *"ayants cause"* including creditors, a class not necessarily included in the term "assigns." C. N. 921; Fuzier-Hermann, Vol. 11, p. 526, No. 11; C. C. 3556, *verbo* "Assigns;" Tomkins vs. Prentice, 12 Ann. 465.

We have no authority, then, to exclude collateral heirs from the right here claimed because they were excluded by the Spanish law, nor

to include creditors because they are included under the French law. Our law, in unambiguous terms, applies to collaterals as well as to ascendents and descendents, and to non-resident as well as to resident heirs; and it confers upon the *"heirs or assigns"* of the forced heir, in the event of his death, or of his assignment of his right, the identical right of action which he himself possessed. The rights of non-resident forced heirs have been recognized on more than one occasion by this court. Hoggatt vs. Gibbs, 12 Ann. 770; Same vs. Same, 15 Ann. 700; Atkinson vs. Rogers, 14 Ann. 633; Estate of Lewis, 32 Ann 388. And the application of the term "heirs," as used in the article cited, to collateral heirs of forced heirs has never been questioned, and we find no reason or authority for holding that it can be successfully questioned now.

It is urged on behalf of the defendants that this suit is in the nature of a petitory action for the recovery of property, the adverse title to which originates in the donation, to the Miles children, contained in the will of Oliver Beirne, and that it is, therefore, a collateral attack upon the probate of such will, and should not be sustained.

It is further insisted that if it be held that the property in question belonged to Oliver Beirne and fell into his succession, it must follow that it also fell within the donation in favor of the Miles children, and that plaintiffs' remedy lies in an action to reduce said donation.

These contentions may be said to have been embodied in the exception of "no cause of action," which was disposed of upon the original hearing, and we are still of the opinion that they are not well founded. The first seems to be equally inconsistent with the theory of the case as propounded by the plaintiffs and with the position of the defendants, as assumed in their pleadings, since neither plaintiffs nor defendants are claiming that the will of Oliver Beirne, *as probated,* operated upon the property in controversy, and hence the demand for the recovery of such property involves no attack upon such probate. As to the second, the primary object of this suit is to have it determined that the property in question belonged to Oliver Beirne's succession, and it is clear that it might be maintained for the accomplishment of that object, as a preliminary to the plaintiffs' ultimate demand for recovery, even although it had not been united therewith, provided the right of the plaintiffs with respect to such ultimate demand still exists. But, we are of opinion that, whilst the plaintiffs have proceeded upon the theory that they are not called upon to bring any action for reduction,

578      SUPREME COURT OF LOUISIANA,

Cox et al. vs. Von Ahlefeldt et al.

the present action, including as it does, a demand, made contradictorily with all the parties in interest, for the recovery of the *legitime* of a forced heir, in property from which, if subjected to the will of the *de cujus,* the forced heir would be excluded, is, in effect, an action for the reduction of an excessive donation. "It is clear," said Martin, C. J., "that where forced heirs are deprived, by will, of their legitimate portion, or less than that amount is given to them, they have an action for the complement of their legitimate part, *the effect of which is to cause a reduction of any other disposition made by the testator to the prejudice of said legitimate part.* * * * This is an action, accorded to forced heirs, to recover that part of the testator's estate which he may have disposed of beyond the disposable part, against those who have thus illegally acquired it." (Italics by the present writer.)   Gardner et als. vs. Harbour et als., 5 M. 410.

To the action for reduction, in the event that the court should hold that the instant suit should be so regarded, the defendants plead the prescription of five years—to meet which, the plaintiffs, through their counsel, invoke the rule, *le mort saisit le vif,* as also certain rules concerning the rights of forced heirs; and they take the position, which is stated in one of the briefs on file, as follows, to-wit: "We deem it an impossible anomaly to hold that, when the law has conferred upon us an ownership and possession, and has prescribed that the universal legatee can never disturb them or acquire any rights except by bringing an action *against us,* that we can be bound to bring an action *against them,* and that our ownership and right of possession can be destroyed by mere failure to bring such action."

The argument in support of the view thus stated appeals largely to French authority, but is silent concerning the following Articles of our own Code, to-wit:

"Art. 1502.   Any disposal of property, whether *inter vivos* or *mortis causa,* exceeding the *quantum* of which a person may legally dispose to the prejudice of the forced heirs, is not null but only reducible to that *quantum.*"

"Art. 1504.   On the death of the donor or testator, the reduction of the donation, whether *inter vivos* or *mortis causa,* can be sued for only by forced heirs or by their heirs or assigns," etc.

"Art. 3542.   The following actions are prescribed by five years:

*      *.      *      *      *      .  *      .  *      *

"That for the reduction of excessive donations.

"This prescription only commences against minors after their majority."

The rule *le mort saisit le vif* is thus expressed in the Civil Code:

"Art. 940. A succession is acquired by the legal heir, who is called by law to the inheritance immediately after the death of the deceased person whom he succeeds. This rule applies also to testamentary heirs, to instituted heirs, and universal legatees, but not to particular legatees."

It will be observed that the application of this article is not confined to legal heirs, and still less to forced heirs, but that it applies, as well, to testamentary heirs, other than particular legatees; from which it follows, construing its provisions with those of Articles 1502, 1504 and 3542, that the testamentary donation of an entire estate, including the *legitime* of the forced heir, confers a title upon the donee, which may be reduced, *pro tanto,* at the suit of the forced heir, or of his heirs or assigns, provided such suit is brought within five years.

Upon the other hand, counsel for plaintiffs invoke Articles 1607 *et seq.* and insist that, under their provisions, as construed with those of Articles 940 *et seq.,* there is, and can be, no necessity for a suit by the forced heir to establish title to his *legitime,* and, hence, that there can be no such thing as prescription against such title. The article particularly mentioned reads: "Art. 1607. When, at the decease of the testator, there are heirs to whom a certain portion of the property is reserved by law, these heirs are seized of right, by his death, of all the effects of the succession, and the universal legatee is bound to demand of them the delivery of the effects included in the testament."

The learned counsel refer us to the commentators on the Code Napoleon, as sustaining the view advanced by them; and, proceeding upon the theory of the identity of the text commented on with that of the Louisiana Code, insist that the view so advanced should be adopted, notwithstanding the fact that, by its adoption, we should be compelled, practically, to eliminate from our law the other provisions which have been quoted.

The text of the two Codes, however, discloses differences of sufficient significance to account for the comments of the authors to whom we are referred and to justify the adoption of a different view by this court. Thus; Article 920 of the Code Napoleon, corresponding to Article 1502 of our Code, contains no equivalents for the words, *"is not null."* It reads: " 920. Les dispositions, soit entre-vifs, soit a cause de

580 . SUPREME COURT OF LOUISIANA,

Cox et al. vs. Von Ahlefeldt et al.

mort, qui excéderent la quotite disponible, seront reductible a cette quotite lors de l'ouverture de la succession." And Article 921 of the Code Napoleon, corresponding to Article 1504 of our Code, reads:

"921. La reduction des dispositions entre-vifs ne pourra etre demandee que par ceux au profit desquels la loi fait la reserve, par leurs heritiers ou ayants cause; les donataires les legataires, ni les creanciers du defunt, ne pourrant demander cette reduction, ni eu profiter."

It will be seen, therefore, that the French law makers abstain from providing that the *"dispositions"* referred to in Article 920 shall not be null; that they abstain from the use of the word *"donation,"* and that Article 921 provides only for an action for the reduction of "dispositions" *inter vivos,* and makes no provision for such an action in cases of donations *mortis causa.* And this distinction is necessarily accorded the respect to which it is entitled, as may be seen from the following excerpt, which we give, as we find it, in the brief of the plaintiff's counsel: "In donations *inter vivos,* the donee is proprietor of the things given, up to the death of the donor and from the moment of the contract, under the condition only of the reductions or revocations ordered by law; and so the forced heir is bound to *proceed by way of action,* and the donor (donee) preserves his possession during the pendency of the suit. It is otherwise with testamentary donations, *even universal.* The forced heirs being alone seized by law, the *universal legatee* is, like the particular legatee, obliged to *demand of them* the delivery of the thing conferred in the legacy; and *when he raises such contestation against them,* the forced heirs continue to retain their seizin during the contestation. Toullier, Vol. 5, p. 145."

This commentary is entirely intelligible when we consider that there is no provision in the French law to the effect that a donation *mortis causa,* in excess of the disposable portion, *"is not null, but only reducible;"* and that there is no provision authorizing, or contemplating, an action in reduction of such donation, the theory of the law itself being that, for the reasons which the learned counsel have presented, the necessity for such an action could never arise. But, as applied to the law of Louisiana, such a commentary would be entirely unintelligible, since it would fail to take into account the fact that the framers of the law, with the French Code before them, have, *ex industria,* used language whereby donations *mortis causa,* as well as *inter vivos,* are recognized as effective until attacked, and whereby specific provision is

made for actions to reduce such donations. It must be presumed that this language was used intelligently and for a purpose. And this court has heretofore acted upon that presumption.

In Austin et als. vs. Palmer, 7 N. S. 20, and Totin vs. Case, Ib. 261, it was held that donations inter vivos and mortis causa, respectively, exceeding the disposable portion, were not void, that they were good, but reducible; and that, in the latter case, the possession of the legatee was that of an owner, and the claim of the forced heir was barred by prescription. It is said that these decisions were rendered before the rule, le mort saisit le vif, was introduced into our law, and are, therefore, entitled to no weight. But as the rule referred to applies as well to the defendants as to the plaintiffs, the inapplicability of the decisions is not so apparent. There are, however, other decisions, of later date. In Young vs. Carl, 6th Ann. 412, decided many years after the introduction of the rule mentioned, it appeared that the defendant's husband left her an interest in his estate exceeding the disposable portion; that the forced heir, a posthumous daughter, died without complaining, and that, subsequently, her brothers and sisters, by her mother's second marriage, sued to reduce the donation. The court said that there was some doubt whether such an action could be cumulated with another demand which was made, and then proceeded as follows: "But, conceding it may, there can be no doubt that, until that action was commenced, she possessed in good faith, under the will, one-half of the property left by her husband at his demise. The disposition in her favor was not null, but only reducible to the disposable portion; and whether it was reduced or not depended upon the future action of her children. Being in possession, under a just title and in good faith, the fruits of the property during that possession can not be recovered from her."

In Tomkins vs. Prentice, 12 Ann. 465, it appeared that Joseph Prentice died without descendents, leaving his estate to his mother, brother and sister, to the exclusion of his father, and that the creditors of the latter sued to reduce the donation. It was held that the creditor being neither heir nor assign, had no right of action. And Mr. Justice Buchanan, in concurring opinion, said, inter alia: "Joseph Prentice's father has, therefore, no interest, whatever, in the succession of the son, unless the will is set aside, partially, by reducing the legacies to the testator's mother, brother and sister, to the disposable portion, for, note, that, by Article 1489 of the Code, a disposition mortis causa

exceeding the disposable portion is not null, but only reducible to the disposable portion."

See also Gardner *et als.* vs. Harbour *et als.,* 5 M. 408; Carroll's Heirs vs. Cabaret, 7 M. 408; Criswell vs. Seay *et als.,* 19 La. 531; Nolan vs. Succession of New, 31 Ann. 553. Whatever, therefore, may be the views of the French writers, as to the proper interpretation of the French Code, and however well founded, there can be no doubt that the Civil Code of this State has been interpreted to mean that the ownership and seizin of the forced heir is so far qualified that the testamentary donee of an interest, including, or impinging upon, his *legitime,* may lawfully hold possession, as owner, until such forced heir demands the reduction of the donation. And we are not prepared to reverse the jurisprudence to that effect.

Arguing, then, upon the assumption that, if an action for reduction be necessary, it is to be found embodied in the proceeding before the court, the counsel contend that no prescription ran against Susan Beirne Robinson after she attained majority, because she was an imbecile, whose incapacity had been recognized by the court having jurisdiction of her person. The law upon this subject, as contained in the Civil Code, reads as follows, to-wit:

"Art. 3521. Prescription runs against all persons unless they are included in some exception established by law."

There is an exception established by law in favor of minors and persons under interdiction with respect to prescription generally, and minors are especially excepted from the prescription provided by Article 3542, against actions for the reduction of excessive donations. But there is no exception, general or special, established by law, in favor of imbeciles or insane persons, not under interdiction. It follows, therefore, that the prescription here pleaded did not run against Susan Beirne Robinson during her minority, but that it began to run from the moment that she attained her majority. The fact that Mrs. Von Ahlefeldt, her guardian during her minority, continued to act in that capacity after she attained majority does not affect the question, as, in order to deny to her the status of a person *sui juris,* the law of West Virginia, like the law of Louisiana, and of other civilized communities, requires formal proceedings, based upon notice, to the person whose rights are to be affected. Evans vs. Johnson *et al.,* 19 S. E. Reporter, 623 (West Virginia); Hansell vs. Hansell, 44 Ann. 546; Blanc vs. Blanc, Journal de Palais, 1867, p. 366; Fuzier-Hermann, Art. 2251.

If it could be shown that she sustained any injury by reason of the failure of those whose duty it was to take the proceedings necessary to bring her within the exception established in favor of persons under interdiction, it is possible that she might have found a remedy in an action in damages, but as the plaintiffs herein are among her nearest relatives, it would seem that they are as much to blame as any one else and might, reasonably, have been made defendants in such an action.

It is said that the maxim, *contra non valentum agere non currit prescriptio,* supplies an exception in favor of imbeciles. But as that maxim is not incorporated in the law of this State it is impossible to reconcile the suggestion with the plain language of the Code, already quoted, to the effect, that prescription runs against all persons, unless they are included in the exceptions established by law; and it was no doubt this impossibility which led this court to hold that the maxim invoked "has no application in our system of jurisprudence." Smith vs. Stewart, 21 Ann. 75; Soulie vs. Ransom, 29 Ann. 170; Succession of Winn, 33 Ann. 1397. The ruling in Succession of Ball, 43 Ann. 342, does not seem to us to touch the question at issue here. In that case, the applicability of the prescription to the persons against whom it was invoked was not disputed. The question was, when did the prescription begin to run? In Succession of Farmer, 32 Ann. 1037; McKnight vs. Calhoun & Lane, 36 Ann. 408, and Norres vs. Hayes, 44 Ann. 907, it was held that prescription does not run in favor of an individual and against a succession of which he is the administrator, pending his administration. It can readily be seen, however, that there were legal principles entering into the consideration of these cases which have no bearing here. But, even if the ruling thus made be regarded as a departure from the doctrine recognized in the cases before cited, we do not feel called upon to widen the breach, for the purposes of the case now before the court. Whether prescription shall run or shall be suspended with respect to a particular person, or a particular claim, is a matter for legislative action. And, in the language of Chief Justice Marshall, in a case which was not within the letter of the prescription pleaded: "Wherever the situation of a party was such as to furnish a motive for excepting him from the operation of the law, the legislature made the exception. It would be going far for this court to add to those exceptions." McIver vs. Ragan, 2 Wheaton, 28.

There is no more reason for excepting an adult imbecile than a

584 SUPREME COURT OF LOUISIANA,

Cox et al. vs. Von Ahlefeldt et al.

suckling infant or an interdicted maniac, and yet, whilst the General Assembly has seen fit to establish exceptions in favor of the infant and the maniac, it has, by other express legislation, declared that, *quoad* certain enumerated causes of action, the exceptions so established shall not apply, so that prescription runs against them, reserving their recourse against their tutors or curators, with respect to actions on notes and bills, suits for possession, and quite a number of other matters. C. C. 3541. We have, therefore, what amounts to a specific declaration by the law, itself, that mere inability to sue shall not suspend prescription, but that persons incapable of acting for themselves shall be within, or without, the rule, as the law shall provide, and not otherwise.

It is further contended that there was fraud in this case, and that prescription runs against those affected by it only from the date of its discovery. In this connection, it is just to the memory of Mr. Beirne, and necessary to a proper understanding of this opinion, that we should say that, whilst we are convinced, for reasons which speak from the face of the record, that it was the purpose of Mr. Beirne to secure the reversion of the bulk of his estate to his Miles grandchildren, and whilst the facts which have been established are inconsistent with the possibility of a real sale by him of his Louisiana property to Mrs. Von Ahlefeldt, we have, upon the whole, found no reason for indulging in harsh criticism of either his purpose or his methods. He had made a contract whereby he was bound to provide his imbecile grand-daughter with everything which she could need, use, or enjoy, during her life. and no moral law required that he should make her the nominal owner of wealth, of the possession of which she could never even be conscious, merely that, when the flickering spark which animated her frail body should die out, such wealth should fall to strangers, to the deprivation of those of his own blood. The statute law of his domicile imposed no such obligation, nor did the statute law of Louisiana in so far as concerned any movable property which he might have owned in this State. In other words, if his entire estate in Louisiana had consisted of movable property, he could, *under the law of Louisiana,* have excluded Susan Beirne Robinson from participation therein. Atkinson vs. Rogers, 14 Ann. 633; In the matter of the estate of Lewis, 32 Ann. 385. With respect to immovables, the case was different, and he knew it, and acted with reference to that knowledge. But there was no attempt at either fraud or concealment. It seemed reasonably certain that the child, imbecile of body as well as of mind, would die before her father,

and as she, herself, had no capacity either to use or to dispose of more than she was already provided with, and as her father was to succeed to whatever rights and property she possessed, or might inherit, he was, apparently, the only person really interested in such rights and property. Mr. Beirne, therefore, went to him, or, perhaps, he went to Mr. Beirne, and they entered into the contract referred to in the statement of facts. Mr. Robinson was at that time without other income than such as he could earn by the management of a farm, the net rental value of which is shown to have been about $500 *per annum;* and, for his interest in said farm, together with the relinquishment of his rights as the presumptive heir of his daughter, he received $100,000.00 in cash, and was relieved of the burden of maintaining his daughter, which involved an expense of about $600 *per annum.* It is true that, in so far as he sold and relinquished his rights as the presumptive heir of his living daughter the contract was not susceptible of enforcement in this State, but it would have become effective by his failure, in the event of the death of Oliver Beirne and of Susan Beirne Robinson, to claim the *legitime* of the latter; and there is no reason to suppose, in view of the contract which he had made, and the consideration which he had received, that any such claim would have been set up by him. With respect to that, however, Beirne assumed the risk, with the knowledge that Robinson would not be permitted to retain the consideration whilst repudiating the contract. The contingency which has actually arisen, *i. e.,* that the imbecile child would outlive her father, and that other persons than he would, therefore, succeed to her rights, as the forced heir of her grandfather, was, apparently, not contemplated, and no provision was made concerning it,—the putting of the property in the name of Mrs. Von Ahlefeldt having been, as we think, merely incidental to the plan to which Henry Robinson was a party, and which assumed that he would succeed to his daughter's rights. If it had been otherwise, and if Oliver Beirne had foreseen that the present plaintiffs would be the heirs of Susan Beirne Robinson, he could, and perhaps would, have provided against their inheriting, through her, any of his property, by making a real, instead of a simulated, sale of his plantations and other immovables in Louisiana, which would have left him free to dispose of the proceeds agreeably to the law of his domicile. Upon the other hand, whatever obligation Henry Robinson may have imposed upon himself, as the presumptive heir of his daughter, his contract with Oliver Beirne imposed no such obligation upon any other person who was in a posi-

tion, in the event of his death, to become such presumptive heir.  The plaintiffs do not inherit from Susan Beirne Robinson by representation of Henry Robinson, but directly, and their rights, as her heirs, were not involved in the contract between Henry Robinson and Oliver Beirne.  Hence there is no estoppel arising therefrom with respect to the assertion of those rights at this time, nor does it affect the question that the plaintiffs are the testamentary heirs of Henry Robinson, since he might have bequeathed the money received by him from Oliver Beirne to whom he pleased.

As matters turned out, however, the arrangements made by Mr. Beirne operate against the plaintiffs as though they had been so designed, and the plaintiffs are entitled to the benefit of the rule which they invoke.  But we have found no reason to change our views, as heretofore expressed, upon the subject of the applicability of that rule in other respects.  Those who claim exemption from prescription by reason of ignorance resulting from fraud must allege and show that such ignorance was neither wilful nor negligent.  "It must appear from the allegations in the petition that the plaintiff had used due diligence to detect the fraud and that he could not by the use of reasonable diligence have made the discovery sooner."  Enc. Pl. & Pr., Vol. 13, p. 245.  "The mere statement in the petition that the plaintiff could not have discovered the fraud by the use of reasonable diligence will not relieve him from the bar of the statute.  He must state the facts upon which he relies that the court may see whether they justify and support such a conclusion."  Bremond vs. McLean, 45 Texas, 10.

It is true that the plaintiffs allege in their petition that "they have only recently discovered the facts establishing" the simulation of the sale to Mrs. Von Ahlefeldt, and this allegation is supported also by their testimony, in general terms.  Upon the other hand, there are certain facts of which they do not plead ignorance, and of which they could not be ignorant without superhuman indifference to matters of great concern to themselves, and yet, the knowledge of which would have informed them, or should, at least, have put them upon inquiry, as to all that they needed to know for the protection of their rights, save, perhaps, the law of Louisiana.  Thus, they can hardly plead ignorance of the source from which Henry Robinson, their brother, derived the money which they inherited from him at his death, in October, 1888.  He had lived, prior to 1885, upon his farm in West Virginia. But, during that year, he moved to Baltimore, where he established his

TERM OF 1900-1901.                587

Cox et al. vs. Von Ahlefeldt et al.

residence; and, three years later, he died in Washington City. If he had never informed them of the arrangement which enabled him to make this change, they certainly became informed of it at his death, since the instrument by which it was witnessed was recorded for public inspection, and they were interested in knowing that all of his estate was accounted for. And that instrument disclosed the fact that Mr. Beirne had paid Mr. Robinson $100,000 for the farm and for the relinquishment of his rights, as the presumptive heir of his daughter. But there was no reason for paying for such relinquishment so far as Beirne's West Virginia estate was concerned, so that there was, at once, a suggestion as to an estate elsewhere. Beyond this, Oliver Beirne had died in April, 1888, so that upon the death of Henry Robinson, in October of that year, the plaintiff's became practically his heirs to the extent of the interest of Susan Beirne Robinson, who was incapable of using, or disposing of, any inheritance that might have fallen to her. We think it reasonable, under the circumstances, to assume that the plaintiffs were informed of the contents of Mr. Beirne's will and codicil and the testamentary letter, all of which were placed of record and admitted to probate in the county court of Monroe County, West Virginia, not only because they were thus placed of record, and open to public inspection, but because the plaintiffs were nearest of kin and heirs-at-law of a frail imbecile, who, in turn, was one of the heirs-at-law of the testator, and the testator was a man of large means, so that both interest and duty required that they should be, and, all human probability justifies the belief that they were, so informed. And, if they were, then here is what they say, in their petition in this case, as to the light which such information was calculated to throw upon the situation, to-wit: "Now your petitioners aver that said testamentary letter clearly shows that said notes were never intended to be collected by Oliver Beirne, but were to be held by him until his death, and were then to be returned to Mrs. Von Ahlefeldt on her reconveying the property to his executors, which confirms the simulation of said pretended sale."

We conclude that the ignorance which prevented the plaintiffs from bringing suit upon their claim was not ignorance of facts, though there were no doubt many material facts of which they were not informed, but ignorance of the law of Louisiana, for which neither Oliver Beirne nor these defendants are to be held responsible.

On behalf of the minors Eppes, and Gwynn Robinson, as to whom

the prescription was suspended, there is a claim for rents and revenues from the date of the death of Oliver Beirne. But, inasmuch as the defendants, in their capacity of universal legatees, were owners, entitled to possession, of the property until demand was made upon them by the plaintiffs, claiming in the right of the forced heir, they are liable for rents only from the date of such demand. It does not, in our opinion, affect the question, that the defendants, for the purposes of this suit, have claimed title by virtue of the deed from Mrs. Von Ahlefeldt. We hold that deed to have been a simulation from which they derived no title; that the property in question belonged to Oliver Beirne at the moment of his death, and was subject to, and was affected by, the provisions of his will; and that the defendants are entitled to the benefit of the position into which they are forced by the judgment which thus ousts them from the position which they had assumed.

Upon the question of the plaintiffs' right of action against the Miles Planting Company, whilst we are not disposed to ignore the important difference which exists between the artificial entity known as a corporation and the individuals of which it is composed and would be prepared to recognize such difference in the instant case, upon the demand of a third person asserting a substantial right; nevertheless, upon the case as presented, the identity of the interest of the Miles heirs with that of the Miles Planting Company appears to us to be such as to withdraw the latter from the category of third persons who, for the purposes of the judgment to be rendered in this case, might be held to be entitled to have the property of the former discussed.

In the decree heretofore handed down, the claim of the minor plaintiffs for their proportion of the $45,000 received as the proceeds of the sale to the Board of Administrators of the Tulane University of Louisiana was overlooked, by reason of the fact that the attention of the court, and of the counsel, was concentrated upon the questions in dispute as bearing upon the larger interest, represented by the plantation property, and the omission with respect to the claim to said proceeds will now be rectified.

It is, therefore, ordered, adjudged, and decreed that the judgment heretofore rendered in this case be now amended, in so far as to condemn the defendants, Wm. Porcher Miles, Jr., Sally Beirne Miles, Betty Beirne Miles, Nanny Miles, Susan Warley Miles and Margaret Melinda Miles, jointly, to pay to the plaintiffs, the minors Eppes and Gwynn Robinson, herein represented by Lizzie Peyton Robinson, the

sum of $1666.66 with interest thereon at the rate of five per cent. per annum from the date of the filing of this suit; and that, as thus amended, said judgment be now reinstated, and made the judgment of this court.

NICHOLLS, C. J. I concur in so far as this judgment affirms the judgment appealed from, and dissent in so far as it amends the judgment appealed from, and reserve the right to hereafter assign my reasons for my opinion.

BLANCHARD, J., concurs in the decree in so far as the same reverses the judgment appealed from and dissents from same in so far as it affirms the said judgment, and for reasons for his dissent refers to the dissenting opinon of the late Mr. Justice WATKINS, heretofore handed down. He reserves the right to assign in separate opinion additional reasons for dissent.

PROVOSTY, J., takes no part.