**ALEXANDER v. GRAY et al.**

No. 5664.

Court of Appeal of Louisiana.
Second Circuit.

April 29, 1938.

Kennon & Kitchens, of Minden, for appellant.

A. S. Drew, of Minden, for appellees.

TALIAFERRO, Judge.

This is a petitory action in which the plaintiff, Jacob Elmer Alexander, seeks to recover an undivided half interest in and to the S. E. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ and a strip of 20.00 acres, 110 yards wide, off of the north side of the N. $\frac{1}{2}$ of the S. E. $\frac{1}{4}$ of Section 22, Township 22 North, Range 10 West, containing 60.00 acres, in Webster Parish, Louisiana. His right to recover, if any he has, hinges upon the efficacy of the following instrument as a legal adoption of plaintiff by or an indenture having the effect of substituting him as a legal heir of Joseph E. McClaskey and his wife, Nancy E. McClaskey, signatories thereto:

"Walker Kans, July 5th, 1890.

"Know All Men By These Presents:

"That we, Joseph E. McClaskey and Nancy E. McClaskey, hereby bind ourselves and our executors to the following agreement:

"That arriving at the age of 21 years Jacob Elmer Alexander shall receive the rights and privileges and share the same as our own children, providing always that he shall remain under our control and guidance unless released by our consent.

"James H. Alexander and Mary M. Alexander, the parents of Jacob E. Alexander, hereby agree to the within.

"J. E. McClaskey
"N. E. McClaskey
"J. H. Alexander
"Mary M. Alexander

"Subscribed before me the undersigned a Notary public, this 5th day of July, A. D. 1890.

"C. M. Fox
"Commission expires Jan. 11, 1891."

It is alleged that the McClaskeys died intestate in and while residents of the parish of Webster, leaving one child, Laura E. McClaskey, the wife of Charlie B. Watlington; that the above described lands formed

the or a part of the succession of said Mc-Claskeys, and at their death title thereto devolved upon petitioner and Mrs. Watlington in equal proportions; that Mrs. Watlington died intestate in Webster parish on or about September 20, 1936 (and subsequent to the death of her parents), leaving as her sole heirs and legal representatives a daughter, Mrs. Daisy Mae Watlington Gray, and the minors, Irma Jean and Bettie Ray Watlington, sole heirs of Clyde W. Watlington, a predeceased son. Reference is made to mortuary proceedings in said successions in the parish of Webster disclosing that Mrs. Watlington was recognized as the sole heir of her father and mother and sent into possession of their property, including said land, by judgment of the district court of that parish; and also disclosing that Mrs. Gray and the said two minors have been recognized as the sole heirs of Mrs. Watlington by the said court and sent into possession of said land in the proportion of one-half to Mrs. Gray and one-fourth to each of said minors. Plaintiff was not made a party to any of the said proceedings. Mrs. Gray and the said minors, through their natural tutrix, Mrs. Myrtle Hortman Watlington, are impleaded as defendants.

In his original petition plaintiff relies upon the above quoted instrument as a legal and valid act of adoption, under the laws of the states of Kansas and Louisiana, and avers as an ultimate fact that, by virtue of such adoption, on the death of the McClaskeys the ownership of the assets of their successions vested in him and their only child and legal heir, viz., Mrs. Watlington, equally.

To the petition defendants interposed exceptions of no cause and no right of action. In amplification of the exceptions, but not as the sole ground thereof, it is alleged therein that since the McClaskeys left a forced heir, such heir inherited their entire successions to the exclusion of plaintiff, although he be an adopted child. These exceptions were overruled. Thereafter plaintiff filed an amended petition wherein he alleges that since the filing of suit he has learned that the Probate Records of Ellis County, Kansas, in which is located the town of Walker, where said alleged act of adoption was executed, were destroyed by fire in the year 1890; and further pleads as follows:

"That in the alternative, and in the alternative only, petitioner shows that if the said instrument described in paragraphs 1, 2 and 3 is not held to be a legal act of adoption under the laws of the state of Kansas, then in that event, and in that event only, petitioner would show that same was a binding contract between Joseph E. McClaskey and Nancy E. McClaskey and the parents of petitioner, Jacob Elmer Alexander, namely, James N. Alexander and Mary M. Alexander;

"4. Further pleading in the alternative, and in the alternative only, would show that petitioner lived with the said Joseph E. McClaskey and Nancy E. McClaskey, as their child, until he was more than 21 years of age and was under their control and guidance and was never released by their consent;

"5. Further pleading in the alternative, and in the alternative only, would show that the conditions of said contract were fully carried out by James N. Alexander and Mary M. Alexander and petitioner, Jacob Elmer Alexander, and is fully binding upon the legal heirs of Joseph E. McClaskey and Nancy E. McClaskey, defendants herein, as set forth in said original petition."

The court granted a rehearing on its action overruling defendants' exceptions. Like exceptions were filed as to the supplemental and amended petition. All exceptions were then sustained and the suit dismissed. Plaintiff has appealed.

Defendants' position, as regards the exceptions, is that the instrument relied upon by plaintiff is wholly insufficient and inadequate as an adoption; that it is impotent to serve as the institution of plaintiff as an heir to the McClaskeys because the creation or institution of heirs by contract is not only unknown to the laws of Louisiana, but positively reprobated by them; and lastly, even should said instrument be held to be effective as an adoption, the existence of a forced heir of the McClaskeys at their decease precludes participation by plaintiff in their succession effects.

We shall dispose of these contentions in reverse order. The right of one person to adopt another in this state, within certain limitations, is warranted by Article 214 of the Revised Civil Code, which in part reads as follows:

"Any person may adopt another as his child, except those illegitimate children whom the law prohibits him from acknowledging; but such adoption shall not inter-

fere with the rights of forced heirs. * * *

"The person adopted shall have all the rights of a legitimate child in the estate of the person adopting him except as above stated."

A terse historic account of the origin and foundation of the right of adoption may be found in American Jurisprudence, Volume 1, p. 622, § 3, in which it is said:

"The right of adoption, while known to the ancients of Greece and Rome, and probably to other ancient peoples, and while practiced among many of the continental nations under the civil law from the remotest antiquity, was unknown to the common law of England, and exists in this country in those jurisdictions having that law as the basis of their jurisprudence, only by virtue of statute. The beneficent public policy involved in such statutes has made of them an essential part of the jurisprudence of the United States."

The right to adopt prevailed in Louisiana under the Spanish and French régimes, but was abolished by the Codes of 1808 and 1825 (Title 7, Chap. 4). See Fuselier v. Masse, 4 La. 423. In Adele Vidal v. Commagere, 13 La.Ann. 516, appears a brief but illuminating discussion of adoption from its earliest history to the time of that decision (1858). In that case the court was called upon to determine the meaning of the words "to adopt" employed in an enabling Act of the Legislature whereby Pierre Jean Baptiste Vidal and his wife, Felicite Blanche Power, were authorized "to adopt" a young orphan child, named Adele. In the course of its opinion, the court propounded to itself the following questions:

"What rights did the Legislature intend to confer upon the plaintiff, by authorizing Vidal and wife to adopt her? What was meant by adoption?"

And answered them by saying:

"We are to suppose that the Legislature intended to confer some substantial right by its action; for it cannot be presumed that a formal exertion of the sovereign power was made for a trivial purpose.

"Now, if this formal act is to be construed to confer merely a right to take the orphan into the family to reside, it gives it, as we think, a slight significance. It was a right with which no one would likely interfere, even in the absence of any action of the sovereign power."

The court then briefly reviews the history of the practice of adoption for centuries back, and delivers itself of these most cogent reasonings:

"If we take the most known and usual signification of the words 'to adopt,' we find them to mean 'to take a stranger into one's family, as son and heir; to take one who is not a child and treat him as one, giving him a title to the privileges and rights of a child.' * * *

"Now, when in an enabling or permissive statute, the Legislature has used a word so familiar in its ordinary acceptation, and so well known in the sources of our law, does it become the judiciary to say that it has not such meaning, because the lawgiver has not himself expressly defined the sense in which he intended the word should be taken? Can the court say that when he used this comprehensive word, he did not intend it as ordinarily understood? That it only meant to place this helpless orphan under the protection of these friends (who had thus far nourished and protected her) until she should become twenty-one years of age or be married, and that then the tie should be severed? * * *

"We conclude, therefore, that, as by the common acceptation of the word adoption, the relationship of parent and child with all the consequences of that relationship is understood, as such was the legal meaning of the word under the former laws of Louisiana, and as such is its acceptation among civilians and those conversant with the sources of our laws, we cannot say that the Legislature used the word in a more restrained sense; in a sense not understood in common parlance, not given in any dictionary, and not known in any system of laws. As by the former laws of Louisiana, the person adopted bore the relation of child to the person adopting, and inherited his estate, so we think the Legislature, by the solemn expression of its will, intended to confer the same right upon the plaintiff to the estate of those who were authorized to adopt her."

The abrogated status of the right of adoption in Louisiana continued in effect until the passage of Act 48 of 1865. The right was thereby legalized. Under this act, the right of adoption by a person having legitimate issue was forbidden. This inhibition was specifically removed by Act 17 of 1867. Act 64 of 1868 amended the Act of 1865, without reference to the Amendatory Act of 1867. To the existence of these

three acts, sanctioned by constitutional permit, may be accredited Article 214 of the Revised Civil Code of 1870 and Sections 2322 et seq., of the Revised Statutes of that year. The codal article is not so prolix as the Act of 1865. It does not prescribe any particular method or form to be pursued to accomplish an adoption, but Act 31 of 1872 provides that acts of adoption shall be passed before a parish recorder or a notary public. This act was amended and the scope in which adoption might be exercised was materially enlarged by Act 48 of 1924. However, Act 46 of 1932, a comprehensive law on the subject of adoption, repealed all laws and acts in conflict therewith.

In Succession of Vollmer, 40 La.Ann. 593, 4 So. 254, it was held that since the passage of Act 31 of 1872, judicial sanction was unnecessary to the valid confection of an adoption. The converse is true under the 1932 Act.

 The amendment (act of 1867) which permits a person having legitimate issue to adopt another is as follows:

"That any person or persons, having legitimate issue, may be allowed to adopt any other child, provided that said adoption does not interfere with the rights of forced heirs."

This basic change in the law appears to us to be of far-reaching significance. It legalized that which ere then had been expressly declared illegal. It permits a parent to invest with the attributes of heirship, within the limitations specified, one who is a stranger to him or his, and thereby devolve upon the adoptive the right to participate in his succession as heir, concurrently, to some extent, with his own offspring. The nature and extent of such participation is an issue in this case and has been an issue in other cases. If it be true, as contended by exceptor, that an adopted heir may only participate as such in the succession of the adoptant in the absence of forced heirs, then the amendment of 1867 is meaningless and was an idle gesture of the Legislature. The adoption itself would be wholly without legal effect as such, save possibly to create an apprenticeship relation. Such a construction, it seems to us, would lead to absurdity. This result flows from such a construction: a person having forced heirs may adopt another, but the existence of such forced heirs bars the adoptive from participating to any extent as heir (except by will)

in the succession of the adoptant. The legal significance of adoption itself positively negatives such an inference. Adoption cannot produce such non-results. It would mean, as Merrick, Chief Justice, so forcefully says in the Vidal Case, supra, that the relationship would continue until the adoptive reached twenty-one years of age or was married "and that then the tie should be severed." This would be more like an apprenticeship. Adoption, from its earliest history, was intended to, and in fact does, "confer some substantial right" upon the person, the object of it. Article 214 of the Code does no violence to this age old principle, but adds to its force in declaring that the one adopted "shall have all the rights of a legitimate child in the estate of the [deceased]", etc., "except as above stated". If the adopted child may not at all share in the estate of the adopter where forced heirs exist, then this clause, supposed to guarantee a right, expires from its own impotency. If such an interpretation can be reasonably given said article, it can only be due to the proviso therein that,—

"Such adoption shall not interfere with the rights of forced heirs."

It is here pertinent to inquire,—what rights of forced heirs (as such) are here referred to? We think these are clearly defined by the following articles of the Civil Code:

"Donations inter vivos or mortis causa can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one-half, if he leaves two children; and one-third, if he leaves three or a greater number. * * *" Article 1493.

"Donations inter vivos or mortis causa can not exceed two-thirds of the property, if the disposer, having no children, leave a father, mother or both." Article 1494.

"In the cases prescribed by the two last preceding articles, the heirs are called forced heirs, because the donor can not deprive them of the portion of his estate reserved for them by law, except in cases where he has a just cause to disinherit them." Article 1495.

It seems reasonably clear to us that within the meaning and intendment of Article 214 of the Code, the term "rights of forced heirs" simply comprehends and was intended to embrace only that interest in a succession of which such heirs may not be deprived, save for cause. In other words, the legitime. It is mainly because of this

644

fixed and determined right in a succession that such heirs are denominated "forced heirs". The designation also distinguishes them from presumptive heirs. Article 880, Civil Code. Their interest is forced upon the estate by law and may not be unfavorably modified or affected by the deceased save for cause.

Chief Justice Bermudez, in Succession of Hosser, 37 La.Ann. 839, 841, in our opinion, has clearly and correctly defined the rights and privileges of an adopted person in this state, and in doing so has in like manner fixed the rights of forced heirs into which an adopted heir may not project a claim. We quote at length from what he said in that case:

"The act of adoption conferred on the adopted child, all the rights constituting the relation of parent and child and all the consequences flowing from that relationship, as against the adoptors; with this restriction, that the adoption was not to interfere with the rights of their forced heirs, that is: of the legitime of such heirs.

"Such must have been the understanding of the law by the parties, for, in the act of adoption, they expressly declare that they do adopt Louis Mitchler and invest him with all the rights and privileges appertaining to legitimate children, and for all intents and purposes, consider him as if he was actually and in fact their legitimate son,—it being understood that the adoption shall not affect the right of forced heirs, if any.

"The rights conferred were those of a legitimate child, that is: rights to inherit both without, and notwithstanding a will.

"It therefore follows that the attempt to divest such rights must necessarily prove of no effect beyond the disposable portion.

"As Mrs. Lilienthal left no forced heir, the adoption could not and did not clash with the rights of any forced heir, and the adopted child was called to inherit from her, as though he were a legitimate child, born of her body; otherwise he would have had to take from the disposable portion."

The soundness of this reasoning seems beyond dispute. It is expressly approved and quoted from in Cunningham v. Lawson, 111 La. 1024, 36 So. 107.

The adopted child, under the law and this decision, while relegated for his rights to that part of the deceased's estate not embraced in the legitime, occupies to a certain extent, as regards that portion of the estate, the position of forced heir. He may not be deprived of his right of inheritance even by the last will and testament of the adopter.

These views, we think, find support in Succession of Dielman, 155 La. 496, 502, 99 So. 416. Therein was involved the validity of the last will and testament of an adoptive parent who died without issue. After making certain specific devises, he bequeathed to his wife and adopted daughter the remainder of his estate. His mother intervened in the succession and asserted her right as a forced heir. The wife and adopted daughter took the position that because of the existence of a child, viz., the adopted daughter, the mother was not a forced heir. The court held adversely to this contention and awarded the mother a one-fourth interest in the estate. After discussing the legal effects which flow from an adoption, etc., the court said (page 418):

"Therefore the adopter is forewarned of these results, and must be held to have consented to this further restriction upon his liberty of action with regard to his estate— that is, that his mother or father shall receive their portion, and, when this is taken out, his adopted child shall enjoy 'all of the rights of a legitimate' child."

Why may not the same rule be applied to children (forced heirs) as regards the rights of the adopted child? Give to them their legitime and the requirements of Article 214 of the Civil Code are satisfied. Thereafter, the adopted child comes in for his share of the estate from the disposable portion and enjoys "all of the rights of a legitimate child" in the estate of the adopter, and without "interfering with the rights of forced heirs", as contemplated by law.

In view of the foregoing, it is our opinion that plaintiff's theory of the extent of his rights as adopted heir in and to the successions of the McClaskeys, is correct.

The remaining two points raised by the exceptions may be properly discussed and passed on together.

In this state heirs may not be instituted by contract nor can a person validly renounce a succession not yet devolved, nor can any stipulation be made with regard to such a succession, even with the consent of him whose succession is in question. Revised Civil Code, Articles 978, 1887; Reed v. Crocker, 12 La.Ann. 436; Succession of Ernest Jacobs, 104 La. 447, 29 So.

241; Cox et al. v. Von Ahlefeldt et al., 105 La. 543, 30 So. 175; Murphy v. Murphy, 136 La. 17, 66 So. 382.

In the Cox Case, supra, it was held, as correctly reflected from the syllabus, that,—

"No one is the heir of the living. A transaction based upon the idea of a future right to the succession of one living is devoid of consideration. Though such a stipulation may have been valid in West Virginia, it can have no effect under the civil law."

The gravamen of the agreement under discussion, quoted in full, supra, is that when Jacob Elmer Alexander reached majority he "shall receive the rights and privileges and share the same as" the children of the McClaskeys, provided that Alexander should always remain under their control and guidance unless released by their consent. Giving to these stipulations the interpretation which the language thereof clearly imports, they mean that if Alexander complied with the obligation therein imposed upon him and lived to be twenty-one years of age, he would then occupy the status of heir of the McClaskeys, on the same basis as their heirs of blood, provided, however, that the McClaskeys during said interim did not, as they had the right to do, release him from the binding force of the agreement.

It is not alleged that the agreement relied on by plaintiff received judicial sanction or approval where executed nor is it alleged that it was there registered. It bears no inscription indicative of registry. It is alleged that the Probate records of the county wherein the agreement was executed were thereafter destroyed by fire and, inferentially, for this reason it could not be proven that the agreement was probated by the court there, if such was done. The laws of the state of Kansas applicable to instruments of this character are not quoted in full nor is their substance given. That the instrument is valid as an adoption under the laws of Kansas is a legal conclusion. In such circumstances, the laws of that state must be presumed to be the same as our own. Roehl v. Porteous, 47 La.Ann. 1582, 18 So. 645; Mulling v. Jones, 142 La. 300, 76 So. 720; Busby v. Busby, 168 La. 510, 512, 122 So. 599.

Judicial cognizance will not be taken of the existence and nature of the laws of a sister state. When relied upon by a litigant, they must be proven as any other fact in the case. See John Surgan v. L. E. Parker, 181 So. 86, decided by this court in April, 1938, and the authorities cited therein.

If said instrument has the force and effect of an act of adoption under the laws of Kansas, it would be so recognized in this state. Succession of Caldwell, 114 La. 195, 38 So. 140, 108 Am.St.Rep. 341.

Such recognition would be required by the "full faith and credit clause" of the Federal Constitution, U.S.C.A.Const. art. 4, § 1, 2 Corpus Juris Secundum, Adoption of Children, p. 459, § 66, has this to say on the subject:

"According to some authority, and probably the better rule, foreign adoption statutes have no extra-territorial effect, and the right of inheritance of the adopted child is governed by the law of the state in which the succession takes place and not by the statute under which he was adopted, the effect of the doctrine of comity being to regard children of foreign adoption, whose rights are to be adjudicated in the forum, in the same light as though they had been duly adopted under the laws of the forum, at least in so far as real estate is concerned, even though the foreign adoption be by a method different from the domestic one."

We are certain that the instrument in question does not meet the requirements of the laws of Louisiana relative to adoption. In the first place, the word "adopt" does not appear therein. It is conspicuous for its absence; its absence is significant. The significance of the word is known to every intelligent person. It is a household word. It would be a most singular and uncommon happening for persons not to employ the word in a document designed to create the reciprocal rights and duties imposed by an adoption. Such an act, to meet legal requirements, must be from its very nature absolute, unconditional and unequivocal. It is designed to and does confer substantial rights. It may not be receded from at the will or caprice of the adopter; and where the instrument itself, relied on as an adoption, as in the present case, contains stipulations and conditions of a suspensive and potestative nature, it fails of its own intrinsic weakness. An adoption, in the legal sense of the term, may not be valid today and invalid tomorrow. The fact that such an instrument depends for its continued existence upon the volition of either or both of the parties thereto, is sufficient to strike it down as an absolute nullity. And what we here say applies with equal force to the contention that the same

instrument is by its terms sufficient to institute plaintiff as heir of the McClaskeys, even though it be conceded arguendo that such a thing is possible under the laws of this state.

The judgment appealed from is affirmed, with costs.

DREW, J., recused.