ODOM, Justice.
 

 Louis Victor Lapleau died without issue in the State of Colorado on September 15, 1914. On the day previous to his death, he made a last will in nuncupative form, naming his wife, Charlotte Sullivan Lapleau, his sole heir, and bequeathing to her all of his property. He named her as executrix of the will without bond. The widow opened the succession of her husband in New Orleans on November 5, 1914, when she made application to the Civil District Court of the Parish of Orleans to have the will probated. The will was duly proved, and on December 21 there was judgment ordering that the will be registered and executed, that Mrs. Charlotte Sullivan Lapleau be confirmed as testamentary executrix without bond, and that letters as such issue to her upon her taking the oath prescribed by law. It was further ordered that a commission issue, directed to the clerk of court of the Parish of Rapides (should be Parish of Acadia) for the taking of an inventory of property in said parish in. which deceased had an interest.
 

 The mother of Louis Victor Lapleau died intestate in the Parish of Acadia in 1911, leaving an estate consisting solely of her community interest in some real estate and personal property situated in that-parish. This property was inherited by her five children, Louis Victor Lapleau being one of them. This was the only property owned by Louis Victor Lapleau at the time of his death.
 

 The widow of Louis Victor Lapleau made no effort to take possession of the property bequeathed to her by her husband until the year 1934. The reason for the delay was that Philip Lapleau, the father of Louis Victor Lapleau, had the usufruct of the property. Philip Lapleau died intestate in the Parish of Acadia on September 17, 1934, and shortly thereafter the widow and testamentary heir of Louis Victor Lapleau applied to the District Court of the Parish of Acadia to be. appointed administratrix of the successions .of Philip Lapleau and Mrs. Pauline Dancie Lapleau, his wife. In her application she alleged that she was the instituted heir of her deceased husband and owned an interest in the property belonging to said successions, and that there were debts, both privileged and ordinary, and that an administration was necessary.
 

 
 *523
 
 Her application to administer was opposed by Leon Lapleau, the brother, and by the thre.e sisters of the deceased Louis Victor Lapleau, on various grounds, one of which was that she had no interest whatever in either succession. They denied that Louis Victor Lapleau had left a valid last will. This defense was not urged in the court below and is not urged here. Opponents plead in the alternative that, in case it should be held that their brother, Louis Victor Lapleau, had left a valid will and that he had bequeathed all of his property to his widow, she could not be recognized as having any interest in the successions of Philip Lapleau and Mrs. Pauline Dancie Lapleau for the reason that the purported will had been probated in the Civil District Court of the Parish of Orleans, which court was without jurisdiction because Louis Victor Lapleau was not domiciled in the Parish of Orleans at the time of his death. For this reason it was alleged that the probate of the will was utterly null, void and of no effect.
 

 Opponents further alleged in the alternative that, if it should be held that the Civil District Court of the Parish of Orleans had jurisdiction and. that the succession of Louis Victor Lapleau was properly opened in the Parish of Orleans, the testamentary disposition in favor of the widow exceeded the disposable portion of his property under the law, and they prayed that it be reduced. This demand for reduction was opposed by the widow on the ground that the action to reduce was barred by the prescription of five years, under Article 3542 of the Revised Civil Code.
 

 The pleadings in this case and the documents annexed cover about 170 typewritten pages. Various and sundry issues were raised. But it would subserve no useful purpose to mention all of them here, for the reason that the only issues before this court now are whether Louis Victor Lapleau had his domicile in the City of New Orleans at the time of his death, and whether the action to have the testamentary disposition in favor of the widow reduced to the disposable portion has prescribed.
 

 The trial judge, in an elaborate written opinion, held that Louis Victor Lapleau was domiciled in the City of New Orleans at the time of his death and that therefore the Civil District Court of the Parish of Orleans had jurisdiction to probate the will, and held further that the action to reduce the testamentary disposition had prescribed. He further held that the right of the widow to prosecute her claim to an interest in the property belonging to the community which existed between Philip Lapleau and his wife, Pauline Dancie Lapleau, should be reserved. There was formal judgment in accordance with these rulings, and from that judgment the brother and the sisters of the deceased Louis Victor Lapleau appealed.
 

 We take up first the question of domicile. According to Article 935 of the Revised Civil Code the place of opening a succession is fixed “In the parish where the deceased resided, if he had a fixed domicile or residence in this State”. And, if he had neither domicile nor residence in this state, then it is fixed “In the parish where
 
 *525
 
 the deceased owned immovable property, * * * or in the parish in which it appears . by the inventory, his principal effects are, if he have effects in different parishes”. And by the terms of the same article, if the deceased had no fixed residence nor any immovable effects within this state, then the succession must be opened “In the parish in which the deceased has died”. Code of Practice, Article 929.
 

 Louis Victor Lapleau died in Denver, Colorado, where he was sojourning for the benefit of his health, and he owned no property of any character in the Parish of Orleans. The only property he owned was the interest he had inherited from his mother in property situated outside the Parish of Orleans.
 

 His succession was opened in the Parish of Orleans. That was the proper place to open it “if he had a fixed domicile or residence” there. If he did not, then the Civil District Court of that parish had no jurisdiction to probate the will and the entire proceeding was null, void, and had no effect because the only property which he owned was situated in the Parish of Acadia. See Succession of Franklin, 164 La. 654, 114 So. 583; Taylor v. Williams, 162 La. 92, 110 So. 100; Succession of Lewis, 174 La. 901, 142 So. 121.
 

 If the probate proceeding in this case was a nullity, then the last will of Louis Victor Lapleau has no effect even though valid (Revised Civil Code, Article 1644; Succession of Mrs. Leontine A. Dambly, La.Sup., 186 So. 7), and his widow, the instituted heir, has no standing yet to claim his succession.
 

 Therefore it is material and necessary to determine whether Louis Victor Lapleau was domiciled in the Parish of Orleans at the time of his death. The domicile of his parents was in the Parish of Acadia, and there is where he was reared and there is where he had his domicile at the time he reached the age ■ of majority. There is no record evidence that he changed his domicile, or that he intended to do so. Article 41 of the Revised Civil Code provides that “A change of domicile from one parish to another is produced by the act of residing in another parish, combined with the intention of making one’s principal establishment there”. And Article 42 of the Code provides that “This intention is proved by an express declaration of it before the recorders of the parishes, from which and to which he shall intend to remove. This declaration is made in writing, is signed by the party making it, and registered by the recorder”.
 

 Article 43 of the Code provides that “In case this declaration is not made, the proof of this intention shall depend upon circumstances”.
 

 No written declaration of his intention to change his domicile from the Parish of Acadia having been made by him, we must, in order to determine whether he had his domicile in the Parish of Orleans at the time of his death, look to the circumstances indicating what his intention in that respect was.
 

 According to Article 38 of the Revised Civil Code, which is found under the gen.eral heading “Of Domicile and the Manner of Changing the Same”, “The domicile
 
 *527
 
 of each citizen is in the parish wherein he has his principal' establishment”, and the same article provides that “The principal 'establishment is that in which he makes his habitual residence”. And it further provides that, if he resides alternately in several parishes and nearly as much in one-as in another and has not declared his intention in the manner hereinafter prescribed, “any one of the said places where he resides may be considered as his principal -establishment, at the option of the persons whose interests are thereby affected”.
 

 The testimony shows beyond question not only that Louis Victor Lapleau did have his principal establishment in the Parish of Orleans at the time of his death, but that he intended to make that parish his domicile. He entered Tulane University in New Orleans in 1908, from which he was graduated in June, 1912. During a portion of the time he was attending the University, he boarded at the home of Mrs. Sullivan on Broadway, where he met her daughter, Charlotte. He was a civil engineer by profession and shortly after his graduation was employed on a road project in Iberia Parish. While thus employed, he returned to the City of New Orleans,, where he married Charlotte Sullivan on December 4, 1912. He returned to his work immediately, and he and his wife boarded at a hotel in Jeanerette, in the Parish of Iberia, until his work there was completed in March or April, 1913. From there he and his wife went to the City of New Orleans and' immediately began to reside at the home of his wife’s mother on Broadway. Shortly thereafter -he was employed as • engineer on another road project,- where he worked for some four or five months, during which time he and his wife continued to reside with her mother. His work was near New Orleans so that he could and did-leave, home in the morning, attend to his duties during the day, and return home at night.
 

 His health failed in the latter part of the year 1913. He was advised by physicians to go to Covington, Louisiana, a resort recommended as beneficial to tubercular patients. He and his wife went there and stayed until the early part of 1914. Finding no relief there, he and his wife returned to her mother’s home in New Orleans. He was then advised by physicians to go to Denver, in the State of Colorado, for the benefit of his health. He and his wife made a short visit to the home of his father in the Parish of Acadia, and from there they departed for Denver, where he died in September of that year.
 

 The testimony shows that, during the entire time he was employed as engineer on the road project near New Orleans, he and his wife resided with her mother in New Orleans. Thereafter, his absences from his home there were purely temporary and only for the benefit of his health.
 

 Numerous witnesses were called and questioned' as to whether he had ever stated what his intentions were as to the establishment of a domicile. Among these was his widow. She stated positively that he intended to make his permanent home in the City .of New Orleans; that she had frequently, heard him say that such .was his intention. Some of the other witnesses testified positively that they
 
 *529
 
 heard him say that he intended to reside permanently in the City of New Orleans; that his stated reason was that he could practice his profession — that of civil engineering — more successfully in New Orleans than in the small interior town of Midland, in the Parish of Acadia, where he was reared. Practically all the witnesses stated that they had heard him say that he liked the City of New Orleans, that he had made many social and business friends in that city, that he preferred to reside there, and that he intended to do so.
 

 Some of these witnesses testified that he stated to them that he hoped to regain his health 'and that as soon as he did he expected to return to the city. In so far as his express intentions are concerned, there is no testimony at all which even indicates that he ever expected to reside elsewhere.
 

 Aside from this, there is a circumstance which strongly indicates that his father understood that, as a matter of fact, his domicile was in the City of New Orleans and that his succession was properly opened there. As we have said the father of the deceased lived until the year 1934. According to the records of this court, the father brought suit in the Civil District Court of the Parish of Orleans against the succession of his deceased son, to recover a large amount which he claimed to have advanced him to enable him to study civil engineering at Tulane University and for moneys advanced to him during the time that he was unable to work on account of ill health. This suit was filed on June 23, 1915, which was only about eight months after the death of his son. That case reached this court in May, 1916, and was decided in March, 1919. See Lapleau v. Succession of Lapleau, 144 La. 988, 81 So. 597. The father was unsuccessful in that lawsuit. Apparently he, on the advice of counsel at that time, recognized the Parish of Orleans as the domicile of'his son at the time of his death. Speaking of this incident, the trial judge who decided the present case aptly said in his written opinion:
 

 “When we say that Mr. Philip Lapleau’s conduct in recognizing the jurisdiction of the Orleans Court, which is now so strenuously attacked, is a circumstance speaking from a knowing-past and prophetically indicative of its correctness and accuracy, we mean to say that he, above all other persons, was possessed of knowledge that his son intended to be domiciled in New Orleans and had carried out that intention.”
 

 As relates to the establishment of a domicile, the jurisprudence is settled that, if there be a bona fide intent to establish a domicile and a bona fide residence of some sort in a, certain place, it is immaterial whether the party live in a boarding-house or in his own home, the two essential elements of acquiring a domicile being actual bona fide residence and the intent to acquire a domicile there. The domicile is fixed as soon as the residence is established with intent to acquire domicile, the duration of the residence being immaterial. Brewster v. Emlet, 168 La. 326, 122 So. 54, and numerous authorities cited.
 

 
 *531
 
 In this case the bona fide residence of Louis Victor Lapleau in the Parish of Orleans for several months and his intent to establish his domicile there are proved to our entire satisfaction.
 

 Louis Victor Lapleau had no children. He bequeathed all his property to his wife. But his father, Philip Lapleau, survived him, and Article 1494 of the Revised Civil Code provides that donations mortis causa “can not exceed two-thirds of the property, if the disposer, having no children, leave a father, mother or both”. The father was a forced heir, and it is therefore clear that the disposition made to the wife exceeded “the quantum of which a person may legally dispose to the prejudice of the forced heirs.” Rev.Civ. Code, Article 1502. That disposition was not null, according to the same article, “but only reducible to that quantum”:
 

 According to Article 1504 of the Code, the “reduction” can be sued for “only by forced heirs, or by their heirs or assigns”. The forced heir, the father, never sued for the reduction. But his heirs are in this proceeding demanding a reduction. The widow, the instituted heir, plead prescription of five years, under Article 3542 of the Code.
 

 That article provides that “The following actions are prescribed by five years”, and specifies “That for the reduction of excessive donations”. But the article does not state when the prescriptive period begins, and the fact that it does not has caused some confusion. That was recognized in the case of Gahn v. Brown, 160 La. 790, 107 So. 576.
 

 As relateá to the question of prescription, the controverted point in this case is whether the five year prescriptive period in bar of actions to reduce excessive donations, as fixed by Article 3542 of the Revised Civil Code, began to run on the date the will was probated or on the date the instituted heir was sent into possession by formal judgment.
 

 The will of Louis Victor Lapleau was probated on December 21, 1914. But the judgment probating the will did not decree in terms that Mrs. Charlotte Sullivan Lapleau, the instituted heir, be sent into possession of the property bequeathed. The judgment sending her into possession was not obtained until 1934, and the demand to reduce was made in much less than five years from that date. Therefore, if prescription began to run back in 1914, when the will was probated, the plea of prescription is good. Otherwise, it is not.
 

 Our opinion is, and we hold, that the prescriptive period began when the will was probated in 1914. The reason is that then is when the cause of action to reduce the excessive donation arose.
 

 It is a well established legal principle, one recognized by this court in numerous cases, that prescription does not begin to run against a person until a cause of action arises in his favor. Gahn v. Brown, supra; Cavanaugh v. Youngblood, 162 La. 22, 110 So. 75; McGuire v. Monroe Scrap Material Co., 189 La. 573, 180 So. 413.
 

 In the McGuire Case, certain machinery was stolen from plaintiff. He knew when,
 
 *533
 
 but not by whom, it was stolen and therefore could bring no civil action against the thief. He finally found parts of his machinery in the possession of the defendant and brought suit against it for damages arising from the unlawful conversion of his property. This being a tort action, defendant plead prescription of one year, the argument being that, in as much as more than one year had elapsed between the date on which the property was stolen and the date on which the suit was brought, the action was barred by the prescription of one year under Article 3536 of the Revised Civil Code.
 

 The facts were that plaintiff did not and could not know when his property was converted by defendant, and, finding that plaintiff brought his suit within one year from the date on which he discovered that defendant had converted the property, we held that the plea of prescription was not well founded. The reason, of course, was that he could not bring his action before the discovery. In the course of our opinion in that case we said [page 415] :
 

 “Prescription began to run against plaintiff’s action against these defendants on the day he discovered the fraudulent appropriation of his property. The doctrine or maxim, Contra non valentem agere non currit prescriptio, has been frequently upheld by this court, where from conditions the plaintiff could not possibly bring his suit.” Citing Cochran v. Violet, 38 La. Ann. 525; McKnight v. Calhoun, 36 La. Ann. 408; Fernandez v. New Orleans, 46 La.Ann. 1130, 15 So. 378; Succession of Farmer, 32 La.Ann. 1037, and Liles v. Producers’ Oil Co., 155 La. 385, 99 So. 339.
 

 Counsel for appellants, in effect, invoke this doctrine. They say in their brief (page 30):
 

 “It does not seem possible that the mere probate of a will, without some claim to adverse possession could mark the beginning of a prescription which would in time bar the right of a forced heir to demand reduction.”
 

 In other words, their argument is that no cause of action to reduce an excessive donation mortis causa arises in favor of a forced heir until the instituted heir takes possession of the bequest.
 

 Counsel have cited no case which supports this argument, and we think it is unsound. On the contrary, there is reason and precedent to support the view that the cause of action arises when the will is probated. The reason is that, when a will is probated, there is spread on the public records a proceeding which makes it definitely known that the deceased has left a last will, who the testamentary heir is, who is entitled to the benefits conferred by the will, the quantum of the estate disposed of, and the name of the person appointed to carry out the provisions of the will. The proceeding provides the forced heir with all the information necessary to enable him to prepare his suit to reduce the disposition to the disposable quantum. He is left in no doubt as to the person against whom his action must be brought. His right to demand a reduction accrues when the will is proved beíore a competent
 
 *535
 
 tribunal, recognized as valid, and its exe■cution is ordered.
 

 It is not the possession of the property which gives rise to the action tb reduce. Such action is grounded upon the proposition that the legitime of the forced heir has been encroached upon or impaired by the testamentary disposition. A suit to reduce is one to set aside a will to the extent that the disposition made therein exceeds the disposable portion. Whether the legitime has been impinged upon is made known, by the probate proceedings. It is the fact that the disposition exceeds the disposable quantum, and not the taking possession of the property bequeathed, which gives rise to the cause of action to reduce.
 

 The same article of the Code (3542) which provides that actions for the reduction of excessive donations are prescribed by five years fixes the same prescriptive period for actions to annul testaments, and this court has in a number of cases held that this prescription begins to run from the date the will is probated.
 

 In Calais v. Semere, 10 La.Ann. 684, the legal heirs of Louis Semere brought suit to set aside his last will on various grounds. One of the defenses urged was that the action to annul was prescribed. In disposing of the plea of prescription, the court said:
 

 "The execution of the will in this case, was ordered by a Court of competent jurisdiction, and the judgment giving. effect to the will formed a sufficient basis for the prescription of the action of nullity.”
 

 In Succession of Williams, 132 La. 865, 61 So. 852, five of the children of David F. Williams filed suit to set aside his will. The defendants plead five-year prescription, and the court said [page 853] :
 

 “The plea of prescription is before us for consideration and decision. If prescription began to run on the date of the death of the testator, plaintiffs’ alleged claim is prescribed, but, if it begins, as contended by .plaintiffs, from the date that the will was probated, it is not prescribed.”
 

 The plaintiffs in that case contended that prescription began to run on the.date of the probate of the will. Defendants’ contention was that prescription began to run on the date of the testator’s death, and they cited and relied upon certain decisions to support the contention. After reviewing the cases cited by defendants, the court said in the Williams Case that these did not support the contention, and, in disposing of the question of prescription, it was said:
 

 “On the other hand, there is reliable authority for holding that prescription begins to run from the date of probation of the testament. We do not think it is difficult to arrive at that conclusion, for it certainly appears reasonable that a judgment forms a sufficient basis for an action .of nullity, and hence that prescription runs from its date. That was substantially the view expressed in Calais v. Semere, 10 La.Ann. 684.”
 

 
 *537
 
 In the Gahn Case, supra, 107 So. 580, it was held on rehearing that prescription began to run when the will was probated, and, referring to other cases where the same ruling was made, the court said:
 

 “In the case of Cox v. Von Ahlefeldt, 105 La. 543, 30 So. 175, the prescription of an action to reduce a testamentary disposition was held to commence to run from the probating of the will, and the same rule seems to have been applied in Succession of Meisner, 121 La. 863, 46 So. 889, and in Succession of Williams, 132 La. [865], 866, 61 So. 852.”
 

 In all these cases the question was whether prescription began to run from the date of the testator’s death or from the probate of his will, and it was held that it began to run from the probate.
 

 While that is not the exact question presented in the case at bar, yet the cases are apposite here, because the ground on which the rulings were based, as explained in the Gahn Case, is that the probate of a will discloses all the facts necessary to enable a forced heir to make his attack.
 

 There is another line of decisions which illustrates the point. We refer to such cases as Jones v. Jones, 119 La. 677, 44 So. 429, in which it was held that actions to annul or reduce donations inter vivos were barred by the prescription of five years dating from the death of the donor. The reason underlying these rulings is that at the death of the donor it is definitely known what quantum of the donor’s property has been disposed of and to whom; so that the forced heir is, at the death of the donor, in possession of all the facts necessary to enable him to bring his action. His cause of action then arises.
 

 Not so as to donations mortis causa. In those cases, the forced heir is in no position to bring suit until the will is probated, for it is only then that the facts are known. Prescription is suspended until then.
 

 It is suggested that our jurisprudence relating to the period which marks the beginning of the prescription in cases of this kind is not uniform and is therefore confusing. After reviewing the cases, we find no ground for confusion.
 

 What has given rise to the confusion is that in some of the cases it was held that prescription began to run on the date of the donor’s death and in others that it began when the will was probated. But the court has not been inconsistent. A careful reading of the opinions will show that, in every case where it was held that prescription began to run at the donor’s death, the donation was inter vivos, not mortis causa. In the Gahn Case, supra, the court, on rehearing, recognized and explained the difference in the application of the prescription to the two classes of cases. We said:
 

 “As stated by counsel for defendant, with respect to donations inter vivos the forced heir can ascertain whether they affect the legitime immediately on the death of the donor, but with respect to testamentary dispositions it is impossible for such heir to determine whether his legitime has been affected until the in
 
 *539
 
 strument purporting to have that effect has been produced and probated.”
 

 So there is, in fact, no inconsistency and no ground for confusion. On the contrary, the court has consistently and uniformly held that prescription begins to run when the cause of action accrues, and not until then. It has not in every case explained the reason underlying the ruling, probably because it was thought that the reason was too apparent to need explanation.
 

 It has never been held that the cause of action to annul or reduce arises when the instituted heir is sent into possession. In some of the cases, the judgment probating the will ordered that the instituted heir be sent into possession. But it has never been held that the judgment sending the heir into possession of the bequest marked the beginning of prescription.
 

 Counsel for appellants complain because the presumptive or forced heir of the deceased was not notified of the probate proceeding. He did not reside in the parish where the will was probated and for that reason was not entitled to notice, under Article 935 of the Code of Practice. Presumptive heirs are entitled to notice if they “reside in the place”. If they reside elsewhere, they are not. Potts v. Potts, 142 La. 906, 77 So. 786; Thomas v. Blair, 111 La. 678, 35 So. 811.
 

 Nor are the appellants entitled to consideration from an equitable standpoint, because their father, the forced heir of Louis Victor Lapleau, knew twenty years before his death that the will had been probated and knew that his son had bequeathed all his property to his wife, Charlotte Sullivan Lapleau.
 

 Counsel for appellants state in their brief that the judgment appealed from should be amended because the appellee was recognized as the owner of an undivided one-tenth interest in Lots 3 and 4, Block 13, Midland, whereas, according to the inventory, the house on said lots does not belong to the succession but is the property of another. The judgment says nothing about the improvements on these lots, and for that reason we take it that the judge did not intend to include the improvements.
 

 As to the cattle, the ruling of the judge is supported by testimony and is in accordance with the law.
 

 For the reasons assigned, the judgment appealed from is affirmed.